In the Matter of the Estate of ERASTUS CORNING, II, Deceased. AURORA, INC., et al., Respondents; ELIZABETH P. CORNING, Individually and as Executrix of ERASTUS CORNING, II, Deceased, et al., Appellants.

Third Department, May 2, 1985

**APPEARANCES OF COUNSEL**

*Hiscock & Barclay* (*Kenneth J. Connolly* of counsel), for Elizabeth P. Corning, appellant.

*Roche & Wolkenbreit, P. C.* (*Robert P. Roche* of counsel), for E. Lloyd Rogers and others, appellants.

*J. Richard Williams, P.C.,* for Aurora, Inc., respondent.
*Jerome K. Frost* for Albany Associates, Inc., respondent.

### OPINION OF THE COURT

MAHONEY, P. J.

Erastus Corning, II, died May 28, 1983, a resident of the City and County of Albany. His last will and testament, duly admitted to probate on June 13, 1983, named his widow, Elizabeth P. Corning, sole beneficiary and executrix of his estate. Among the assets of his estate were 160 shares of the capital stock of Albany Associates, Inc., a general insurance agency formed by Corning and others in 1932 which is licensed for and has acted as an insurance agent and/or broker for approximately 34 insurers authorized to sell life, health and property insurance against loss or damages of any kind. In 1962, Corning became the sole stockholder of Albany Associates. He thereafter served as president and a member of the board of directors together with J. Otto Fausel and E. Lloyd Rogers, who joined the corporation on June 9, 1947 and August 1, 1957, respectively. In return for his services as corporate officer and director, Corning, like Fausel and Rogers, received a salary. Albany Associates further paid Corning a commission based upon the volume of insurance premiums attributed to his efforts and also paid him proceeds from an employee profit-sharing plan established by the corporation in 1975. While Fausel and Rogers entered into employment contracts with Albany Associates, there is no record of any such contract between Corning and the corporation.

The employment contracts entered into between Albany Associates and Fausel and Rogers, each dated April 1, 1964, provide that Fausel and Rogers had the right to receive 50% of the commissions received by Albany Associates on the business produced by them. The contracts additionally set forth the salaries Fausel and Rogers were to receive in consideration for their duties as corporate officers and directors. The contracts also granted them the right to all business credited to their personal accounts and the right, upon completion of their employment, to inspect the corporate records of their personal accounts and be furnished a list by the corporation of policies solicited by them that expired each month.

In order to determine the amount of the commission and profit-sharing plan payments due Corning, Albany Associates maintained an internal bookkeeping system whereby the business produced by him could be distinguished from the business produced by Fausel and Rogers and the business produced by the agency itself. This internal bookkeeping system consisted of

separate records or ledgers, commonly called a "book of business" or "expirations", in which Corning, Fausel and Rogers each kept their list of customers and information relevant to insurance policies issued to paid customers. These ledgers were designated "ECII" for Corning's clients, "JOF" for Fausel's clients and "ELR" for Rogers' clients. In addition to the records established by Corning, Fausel and Rogers, an "agency" ledger was established to delineate insurance policies generated by clients whose business was not attributable to the direct efforts of either Corning, Fausel or Rogers. No commissions were paid on account of this business and the income generated thereby went directly to corporate earnings. The compensation each received from the business they generated was above and beyond the salaries each received as officers and directors of Albany Associates.

In 1968, Corning entered into an agreement with Aurora, Inc., a New York corporation in the business of selling insurance, whereby, upon Corning's death, all of the stock he then owned in Albany Associates would be sold to Aurora. The purchase price of the stock was to be the "book value of said stock", which was to be determined by the value of said stock on December 31 of the year previous to Corning's death, as reflected in the accountant's year-end annual report.

After Corning's death, his son, Erastus Corning, III, was made a director and an officer of Albany Associates. Believing that the "book of business" marked "ECII" was the property of Corning's estate, Mrs. Corning, as executrix of the estate, entered into an agreement to sell those expirations to Fausel and Rogers. Thereafter, Fausel and Rogers entered into an agreement with Erastus Corning, III, wherein the latter would purchase said list of expirations from them within 30 days of their respective deaths or within 30 days of their respective retirement from Albany Associates.

This proceeding was commenced in Surrogate's Court on or about September 14, 1983 by the service of an order to show cause and petition upon Mrs. Corning, as executrix of her husband's estate. Said proceeding, which was commenced by Aurora, sought: (1) delivery of the stock of Albany Associates owned by Corning, (2) an order by the court stating who owns the "book of business" marked "ECII", and (3) an injunction directing Fausel, Rogers and Erastus Corning, III, to refrain from disposing of any assets or property of Albany Associates and from acquiring any assets and/or obligations except in the ordinary course of the conduct of the insurance business, and

further enjoining them from engaging in any such conduct as may be contrary to Business Corporation Law §§ 715 and 717.

On or about September 19, 1983, the stock of Albany Associates owned by Corning was transferred to Aurora by Mrs. Corning as contemplated by the August 6, 1968 purchase agreement. On September 27, 1983, at a meeting of the board of directors of Albany Associates, Erastus Corning, III, was removed as president and he subsequently resigned his position as a director of Albany Associates.

Appropriate answers were interposed and an amended petition by Aurora was filed which recognized the transfer of the stock of Albany Associates and, in addition, included a claim for damages in the sum of $500,000 for alleged violation of Business Corporation Law §§ 715 and 717. A counterclaim for a similar amount was interposed by the intervenors, Fausel, Rogers and Erastus Corning, III, which was followed by a claim on behalf of Albany Associates requesting the same relief sought by Aurora. Following motions for summary judgment, Surrogate's Court granted a motion for partial summary judgment to petitioners[*] by deciding, among other things, that: (1) the issue regarding the transfer of stock was moot, (2) petitioners were necessary and interested parties to the litigation, (3) all laws of the State of New York that affect the estate are reviewable by the court, (4) a trial would be held with respect to damages, and (5) the "book of business" marked "ECII" is the property of Albany Associates. Consequently, Surrogate's Court denied the motion of the intervenors and Mrs. Corning to declare the "book of business" the property of the estate. The intervenors and Mrs. Corning now appeal these rulings.

The first issue to be resolved on this appeal concerns that portion of the decree which determined the "book of business" marked "ECII" to be the property of Albany Associates.

In the insurance industry, the term "book of business" or "expirations" has a definite and well-recognized meaning. It refers to a copy of the policy issued to the insured and contains "the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance" (*Phillips & Co. v Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.,* 199 F2d 244, 246, *cert denied* 345 US 906).

Contrary to the operation of normal agency principles, whereby the principal has ownership rights in the lists of

---

[*] Reference to "petitioners" shall include both Albany Associates and Aurora.

customers and other similar data obtained during the agency, it is the custom and practice in the insurance field that, in the absence of a contract to the contrary, the independent insurance agent owns the expirations at the termination of his agency. The practice is a protection of the work product of the individual agent and represents a valuable asset in the nature of goodwill (*Miller Co. v Empire Fire & Mar. Ins. Co.,* 503 F2d 751, 755; *Phillips & Co. v Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., supra,* p 246; *Alliance Ins. Co. v City Realty Co.,* 52 F2d 271, 276; *Garrett v American Family Mut. Ins. Co.,* 520 SW2d 102 [Mo]; 16B Appleman, Insurance Law and Practice § 9026, at 352-353 [1981]). This universal custom is a main premise under which the American insurance industry functions and is known as the American Agency System (*Woodruff v Auto Owners Ins. Co.,* 300 Mich 54, 58-59, 1 NW2d 450, 452; *Garrett v American Family Mut. Ins. Co., supra,* p 112). Such a custom has been recognized in New York for many years and is acknowledged by all parties (*National Fire Ins. Co. v Sullard,* 97 App Div 233). Where the parties disagree, however, is on the issue of who owns the "book of business" identified as "ECII" as between Albany Associates and Corning's estate.

Resolution of this ownership issue mandates an examination of the daily operations of the particular parties (*see, Otto v Imperial Cas. & Indem. Co.,* 277 F2d 889, 895). Here, the record demonstrates that by contract with the various insurers, Albany Associates was consistently designated as agent, assumed sole responsibility for the payment of insurance premiums to the insurer, received premiums directly from the insured and, upon depositing such amounts into its corporate account, paid the insurers and the expenses of the corporation, while retaining the balance as corporate earnings. In the 51 years that Corning sold insurance, he never obtained an individual agent's or broker's license, but acted exclusively as a sublicensee under the licenses issued to Albany Associates (*see,* Insurance Law § 2103 [c]; § 2104 [b]). Thus, while Corning was authorized to solicit insurance and procure risks on behalf of and in the name of Albany Associates, the corporate insurance agent, he could not, independent of the corporation, act either as an insurance agent or broker. These circumstances prevailing, it becomes evident that Albany Associates is the independent insurance agent which owned the expirations.

By definition, an "independent insurance agent" is: "an 'insurance agent' who is not owned or controlled by any insurer or group of insurers and whose agency agreement does not prohibit the representation of other insurers * * * and which provides

that upon termination of the agreement the agent's records and use and control of expirations remain the property of the agent" (Insurance Law § 2101 [b]). Albany Associates clearly meets this statutory definition. As a licensed insurance agent and broker, Albany Associates is not precluded from representing any number of insurers, and indeed does represent 34 different insurers. A review of the various agency agreements set forth in the record shows that they expressly list Albany Associates as agent with ownership rights in the expirations. In his capacity as sublicensee, however, Corning did not enjoy such broad authority. Very clearly, he was prohibited from dealing with either insurers or insureds in any capacity other than as Albany Associates' sublicensee, and thus was not in a position to own the expirations he may have and did, in fact, produce. In short, he merely served as a representative of Albany Associates.

The intervenors' and Mrs. Corning's reliance on *Miller Co. v Empire Fire & Mar. Ins. Co.* (503 F2d 751, *supra*) to establish that Corning owned the expirations as the "insurance agent" with direct customer contact is clearly misplaced. In *Miller*, the court noted that there exists two systems within the American Agency System, a four-tier system and a three-tier system, by which the insurance industry operates (*supra,* at pp 753, 755). In the four-tier system, an insured approaches a local agent to seek insurance, who then contacts an agency, called a general agent, who in turn places the insurance through a company (*supra,* at p 753). The court in *Miller* found that in those cases, the right to the expirations, as between the general agent and the insurer, belongs to the general agent, but as between the general agent and the local agent, the right to the expirations belongs to the local agent. By comparison, in the three-tier system, there is no local agent; the general agent deals directly with the insured and the insurer, and thus owns the expirations. The intervenors and Mrs. Corning argue that, contrary to the Surrogate's reasoning, this case involves a four-tier system and, consequently, the book of expirations was owned by Corning, as local agent. We disagree. A review of the *Miller* case reveals that "[a]ll of the insurance that Miller [the general agent] placed with Empire [the insurance company] was referred to his agency by *independent* insurance agents" (*supra,* at p 752 [emphasis supplied]). These "independent insurance agents" were further defined "as local agents or subagents * * * These local agents had no contractual duty to Miller and were free to place their business elsewhere" (*supra,* at p 752, n 3). The distinction is clear: the four-tier system described in *Miller* necessitates the presence of

both a general agent and an *independent* agent. Such a requirement is consistent with the very purpose of the American Agency System to protect an individual agent's work product by preserving his clientele upon termination of the agency (*supra,* at pp 754, 755-756).

The instant case is clearly distinguishable. Corning, as noted above, was not an *independent* agent, but a sublicensee of Albany Associates, with no authority "to place [his] business elsewhere" (*Miller Co. v Empire Fire & Mar. Ins. Co., supra,* at p 752, n 3). As an employee, director, officer and sublicensee of Albany Associates, Corning owed the basic employer/agent duties to his employer, and could not assert an ownership interest in any information acquired during the course of the agency (Restatement [Second] of Agency §§ 395, 396 comment g; 3 NY Jur 2d, Agency, § 194, at pp 21-22). Consequently, the instant case does not fit into the four-tier system as suggested by the intervenors and Mrs. Corning, but, rather, the three-tier system as recognized by Surrogate's Court. As a corporate insurance agency, Albany Associates necessarily acted through its officers and employees, including Corning; acting in such capacity, Albany Associates may properly be deemed the insurance agent dealing directly with both the insured and insurer under the three-tier system. Supportive of this conclusion is the fact that all insurance policies were countersigned by the corporation as agent and were placed directly by it with the insurers. To hold otherwise would ignore the fact that a "book of business" constitutes a valuable asset in the nature of goodwill (*see, Phillips & Co. v Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co,* 199 F2d 244, 246, *supra; Garrett v American Family Mut. Ins. Co.,* 520 SW2d 102, 112 [Mo], *supra*), which the parties to the 1968 agreement conveying a 100% interest in Albany Associates to Aurora clearly contemplated would be included. Consequently, in our view, as between Albany Associates and the Corning estate, the former owned the "book of business" marked "ECII", and such "book of business" was necessarily conveyed to Aurora as a corporate asset pursuant to the 1968 agreement.

■ As to petitioners' claims of alleged violations of the Business Corporation Law by Mrs. Corning and the intervenors, we are of the view that Surrogate's Court lacks jurisdiction to determine these questions. The alleged violations involve conduct by Fausel, Rogers, Erastus Corning, III, and Mrs. Corning, which concern matters between living persons. Surrogate's Court is a court of limited jurisdiction which can only entertain those matters "relating to the affairs of decedents" (NY Const, art VI, § 12 [d]; SCPA 201 [3]). It seems clear that claims

involving violations of the Business Corporation Law do not affect or relate to the affairs of decedent or the administration of his estate and are, therefore, not properly within the jurisdiction of Surrogate's Court (*Matter of Piccione, 57* NY2d 278, 288). Since the claims specifically seek money from living persons as officers and directors of a corporation, the controversy relates to matters between living persons and does not involve Corning's estate or its representative (*see, Matter of Lainez, 79* AD2d 78, 80, *affd* 55 NY2d 657). Accordingly, these claims should be transferred to Trial Term of Supreme Court, Albany County, for further proceedings related thereto (*see,* NY Const, art VI, § 19 [d]).

KANE, J. (concurring in part and dissenting in part). I agree that Surrogate's Court lacks jurisdiction to determine alleged violations of the Business Corporation Law and that such claims should be transferred to Trial Term of Supreme Court for ultimate disposition.

I disagree with the majority conclusion that the "book of business" designated "ECII" is the property of Albany Associates, Inc. Since my reasoning on this issue differs from that expressed by Justice Levine, I am compelled to dissent separately.

I am in accord with the principle that this issue can only be resolved by examination of the daily operations of the particular parties (*see, Otto v Imperial Cas. & Indem. Co., 277* F2d 889, 895). Here, the record demonstrates that, pursuant to contract, Albany Associates was the agent of the various companies and the sole entity responsible to the insurance companies for the payment of premiums, which were billed in the name of Albany Associates, deposited in its corporate account when received and then paid by corporate check. Corporate expenses, including salaries and commissions, were then paid by Albany Associates and the balance retained as corporate earnings. Erastus Corning, II, J. Otto Fausel and E. Lloyd Rogers, as producers of insurance business in dealing with their respective clients, acted as brokers or subagents of Albany Associates in the day-to-day operations. It was they who were responsible to see that the premiums were paid by the insured to Albany Associates.

The extent of this responsibility is demonstrated by the fact that, on at least one occasion, Corning reimbursed Albany Associates from personal funds for a premium advanced by the general agent on behalf of an insured who had failed to pay the premium due on his policies. Thus, Albany Associates, as the party actually placing the policies of insurance with various

companies, was the general agent. It necessarily follows that, as between the general agent acting on behalf of Corning, Fausel and Rogers, Albany Associates had no contract with the insured. Consequently, Albany Associates cannot be considered to own or control expirations in any particular policy (*Miller Co. v Empire Fire & Mar. Ins. Co.,* 503 F2d 751, 753, 755). The fact that Fausel and Rogers possessed written contracts with the general agent and Corning did not is immaterial, for the contracts in question were declaratory of their common-law rights with added provisions in the event of death or other separation from their employer. Moreover, the fact that Corning operated as an insurance broker for 51 years, as a sublicensee under the license issued to Albany Associates, does not limit his authority as an "insurance agent" under the authority of established case law and the rules and definitions of the American Agency System (*see also,* Insurance Law § 2103 [b], [c]).

Therefore, I disagree with the conclusion reached by Surrogate's Court and would decide that the "book of business" identified as "ECII" was the individual property of Corning's estate and did not pass to Aurora, Inc., upon the sale to it of the stock of Albany Associates. This conclusion is further supported by the fact that the financial statements of Albany Associates, which formed the basis for the determination of the sale value of its stock, contained no reference to the value of Corning's expirations. It did, of course, include the value of the expirations contained in the agency "book", which was separate from the ledger of business maintained by the other three producers, Corning, Fausel and Rogers.

Accordingly, I would reverse the decree of Surrogate's Court.

LEVINE, J. (concurring in part and dissenting in part). I dissent from so much of the majority's decision as affirms Surrogate's Court's determination that the "book of business" marked "ECII" is the property of Albany Associates, Inc., rather than that of the estate of the late Erastus Corning, II. The majority and Surrogate's Court reason that in the absence of an express contract between the parties, the American Agency System applies, under which, as a matter of custom and usage, ownership of the book of business (more commonly called the expirations) is awarded to the producer of the business, i.e., the agent or subagent who procured the insureds as customers. However, the majority further holds that the producer is only entitled to the expirations if he himself is an *independent* agent, able to place the insurance with insurers or through general agents other than his own principal. Since concededly Corning was only

a sublicensee of Albany Associates, deriving all of his legal right to sell insurance in New York through that firm's corporate license, the majority further reasons that Corning was not an independent agent but was rather merely an employee of the firm. The majority concludes from this that ordinary agency rules apply as between Corning and Albany Associates, under which an agent's work product is the property of his principal. Hence, Corning's expirations belonged to Albany Associates, as a matter of law. I respectfully disagree.

To begin with, the majority and Surrogate's Court ascribe critical significance to the fact that Corning was not independently licensed in New York. In none of the cases relied upon by the majority, however, did the result turn on the license status of the subagent. Indeed, in the leading case of *Woodruff v Auto Owners Ins. Co.* (300 Mich 54, 1 NW2d 450), followed in *Otto v Imperial Cas. & Indem. Co.* (277 F2d 889) and *Miller Co. v Empire Fire & Mar. Ins. Co.* (503 F2d 751), all cited by the majority, the court held that one Keyser, characterized as a biscuit company salesman who "as a sideline solicited insurance in the defendant company for plaintiff's agency", owned the expirations in the policies he procured. This is hardly descriptive of Keyser's status as a professional, independent insurance agent, which the majority requires as a condition to applying the American Agency System to Corning's expirations. Furthermore, there are at least two cases where the agent's legal authority to write the particular insurance policies in question was derived exclusively from that of its principal, but the agent nevertheless was held to own his expirations (*see, Blume v Curson,* 447 SW2d 727 [Tex]; *Ballagr v Polk-Warren Mut. Ins. Assn.,* 257 Iowa 1334, 136 NW2d 49b). Just as the subagent did in *Blume v Curson* (*supra,* p 730), had Corning during his lifetime terminated his relationship with Albany Associates, he could have availed himself of the property rights he acquired in his expirations by becoming sublicensed with another general agent. If, as I have concluded, the lack of independent licensing of Corning is not preclusive as a matter of law, then whether his arrangement with Albany Associates represented a three-tiered or four-tiered application of the American Agency System becomes a question of fact, dependent upon an examination of the way the parties operated in actual practice (*Otto v Imperial Cas. & Indem. Co., supra,* p 895).

Second, even if the arrangement between the parties was three-tiered because Corning had no independent license, actual agreements between agents and principals in the insurance industry control over any custom and usage under the American

Agency System (*Otto v Imperial Cas. & Indem. Co., supra; Phillips & Co. v Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.,* 199 F2d 244, *cert denied* 354 US 906). The parties' agreement need not be in writing (*Garrett v American Family Mut. Ins. Co.,* 520 SW2d 102, 112 [Mo]). In my view, a triable issue is presented here as to the existence of an implied contract in fact between Corning and Albany Associates under which Corning retained the property rights in his expirations. A contract implied in fact may result as an inference from the facts and circumstances without being formally stated in words, is derived from the presumed intention of the parties as indicated by their conduct, and is just as binding as an express contract arising from declared intention, since there is no distinction between agreements made by words and those made by conduct (*Jemzura v Jemzura,* 36 NY2d 496, 503-504; *Miller v Schloss,* 218 NY 400, 406). Numerous circumstances support a contract implied in fact in the instant case, including (1) the very existence of an individual Corning book of business, separate from that of the corporate entity of which he was the sole stockholder; (2) that he received initial and renewal commissions for premiums received on the policies in that account; (3) that Corning and not Albany Associates, separately compensated J. Otto Fausel and E. Lloyd Rogers for servicing *his* accounts; (4) that Corning reimbursed Albany Associates from personal funds when one of his accounts defaulted in paying a premium advanced by the firm; and (5) that Fausel and Rogers retained their expirations despite similarly operating as sublicensees of Albany Associates. Of further significance, the maintenance of a separate Corning expirations account and all of the foregoing practices with regard thereto apparently existed from the inception of Albany Associates, when there were two other shareholder-principals in the corporation and when it was hardly likely that Corning would have intended not to retain ownership of the business he personally produced. All of this was in place well before Fausel and Rogers became associated with the firm and before the profit-sharing plan was created in 1975, the existence of which the majority cites as an explanation for Corning's keeping a separate book of business.

In short, there are outstanding issues of fact (1) as to the proper application of the American Agency System to Corning's expirations under the circumstances of the case which are not conclusively resolved on the basis that he was not licensed individually as an independent agent, and (2) as to whether, under the circumstances and given the history of the party's practices, there was a contract implied in fact between Albany

Associates and Corning by virtue of which he retained the ownership of his expirations. I would, therefore, reverse the decree of Surrogate's Court and remit the matter for trial of these issues.

CASEY and WEISS, JJ., concur with MAHONEY, P. J.; KANE, J., concurs in part and dissents in part in a separate opinion; LEVINE, J., concurs in part and dissents in part in a separate opinion.

Decree modified, on the law, without costs, by reversing so much thereof as determined that Surrogate's Court had jurisdiction over those claims involving violations of the Business Corporation Law; said claims are transferred to Trial Term of Supreme Court, Albany County, for further proceedings relating thereto; and, as so modified, affirmed.