JOHN BEZDEK INSURANCE
ASSOCIATES, INC., et
al., Appellants,

v.

AMERICAN INDEMNITY COMPANY,
et al., Appellee.

No. 04–91–00567–CV.

Court of Appeals of Texas,
San Antonio.

May 29, 1992.

Rehearing Denied July 15, 1992.

Heriberto Barrera, Rio Grande City, John L. Lancaster, III, David C. Myers, Jackson & Walker, Dallas, Arnulfo Guerra, Guerra, Duvall, Ramirez & Guerra, Roma, Rex N. Leach, Atlas & Hall, McAllen, John Pope, Pope & Guerrero, Rio Grande City, W. Richard Davis, Strasburger & Price, Dallas, Robert B. Summers, Thornton, Summers, Biechlin, Dunham & Brown, Inc., Lawrence G. Morales, Morales & Calderon, San Antonio, Knox D. Nunnally, Robert M. Schick, Catherine Bukowski, Penelope E. Nicholson, Vinson & Elkins, Houston, Baldemar Gutierrez, Law Offices of Baldemar Gutierrez, P.C., Alice, Jesus M. Alvarez, Alvarez & Alvarez, P.C., Rio Grande City, Marie R. Yeates, Vinson & Elkins, L.L.P., Houston, Matias Morin, Jr., Edinburg, John W. Weber, Jr., Small, Craig & Werkenthin, P.C., Paul B. Keller, San Antonio, for appellee.

William W. Sommers, Gardner & Ferguson, Inc., San Antonio, for appellants.

Before REEVES, C.J., and BUTTS and GERALD T. BISSETT,[1] JJ.

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

## OPINION

GERALD T. BISSETT, Assigned Justice.

This is an appeal by John Bezdek Insurance Associates, Inc. ("Associates") and John P. Bezdek individually ("Bezdek"), defendants in the trial court, from a summary judgment, signed on August 8, 1991, in favor of American Indemnity Company, American Fire and Indemnity Company and Texas General Indemnity ("Insurers"). We affirm.

This suit arose out of an "Agency Contract" between the Insurers and the Associates, the local recording agent for the Insurers. Upon Associates' failure to pay premiums (on policies paid by policy holder to them) to the Insurers, the Agency Contract was terminated by the Insurers, who then took over the management of the Associates' "book of business" sometimes referred to as "expirations." The Insurers filed suit on December 3, 1990, against the Associates and Bezdek, who guaranteed the payment of the premiums to them by a written guaranty, attached to the Agency Contract. The Insurers sought to recover all unpaid premiums, attorney's fees, prejudgment interest and costs. The Associates and Bezdek, in their first amended original answer, denied generally the allegations made by the Insurers in their original petition, and pleaded the following affirmative defenses to the action brought against them:

### II.

The plaintiffs have discharged the debt made the subject of this suit by their own conduct.

### III.

Plaintiffs are estopped from proceeding with any action on the debt.

### IV.

Plaintiffs have elected their remedies against their defendant and the guarantor.

The Insurers filed identical motions for summary judgments against the Associates and Bezdek, and alleged: 1) the Agency Contract was entered into on or about October 19, 1989; 2) as of November 15, 1990, the principal account due and owing to them "on account of premiums collected by Defendant Associates" was $17,618.80; 3) "all conditions precedent to establishing Defendant Bezdek's liability under the Guaranty" have occurred; 4) there is no genuine issue as to any material fact necessary to establish each and every element of their cause of action; and 5) they have incurred attorney's fees in the amount of $3,468.75.

The Associates and Bezdek filed a response to the Insurers' motions for summary judgment on July 17, 1991. They alleged: 1) that neither the Associates, the principal obligor, nor Bezdek, the guarantor, received any notice of the sale of the collateral securing the debt as provided in the Contract; 2) the Insurer did not give any notice of the sale required by Sections 9.504 and 9.505 of the Texas Business and Commerce Code.

The summary judgment decreed that the Insurers recover of and from the Associates and Bezdek, jointly and severally, the sum of $17,618.80, attorney's fees in the amount of $3,468.75, interest on both amounts of money from date of judgment at the rate of 10% per annum until paid, and court costs.

■ The Associates and Bezdek contend in a single point of error:

The trial court erred in granting Appellees' Motion for Summary Judgment because the Summary Judgment Response and Proof showed that the Plaintiffs had failed to give the Defendants notice of sale required by Sections 9.504 and 9.505 of the Texas Business and Commerce Code in connection with the enforcement of Appellees' rights under a Security Agreement.

The defense of lack of notice pursuant to the provisions of TEX.BUS. & COM.CODE ANN.[2] §§ 9.504, 9.505 (Vernon 1991) was

---

**2.** Hereafter referred to as "the Code."

raised for the first time in the response to the Insurers' motion for summary judgment. The Insurers argued that such defense, even if relevant, has been waived since it was not pleaded as an affirmative defense by the Associates and Bezdek in their first amended original answer. We do not agree. The Supreme Court of Texas has held that an unpleaded affirmative defense may also serve as the basis for a summary judgment when it is raised in the summary response and the other party does not object to the "lack of a rule 94 pleading in either its written response or before the rendition of judgment." *See Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 494 (Tex.1991). The Insurers did not so object in the instant case.

Sections 9.504 and 9.505 provide that if "the security agreement secures an indebtedness," reasonable notice of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor (and to the guarantor) if the debtor has not signed after default a statement renouncing or modifying his right to notification of sale.

It is conclusively shown by the summary judgment evidence that the total amount of premiums which the Associates failed to pay the Insurers under the Agency Contract is $17,618.80. It is further conclusively established that the Insurers, following default by the Associates, placed the Associates' expirations with another recording agent in order to continue uninterrupted service to the insureds. The Insurers specifically contend that neither the Agency Contract nor the process by which the "expirations" were handled in conjunction with terminating the Agency Contract fall within the scope of Article 9 of the Code. On the other hand, the Associates and Bezdek take the position that the transaction falls within the scope of and is therefore governed by Article 9 of the Code. They denominate the "book of business" as "Accounts" and thereby attempt to bootstrap the transaction into the realm of the Code. We agree with the Insurers.

Section 9.106 of the Code defines "Account" thusly:

> "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

The 1972 Official Comments to Section 9.106 refer to accounts as "the ordinary commercial account receivable," and further states:

> In some special cases a right to receive money not yet earned crystallizes not into an account but into a general intangible, for it is a right to payment of money that is not 'for goods sold or leased or for services rendered.'

Section 9.104 of the Code contains a list of excluded transactions, excluding, among other exclusions, transfers of a right to payment under a contract to an assignee who is also to perform under the contract. In the instant case, the Agency Contract was not assigned. However, the expirations were placed with another agency to be worked; this is analogous to the transfer of a contract with right to payment. The circumstances of the instant case fall within the exclusion of § 9.104(6) of the Code.

▮▮▮ Parties to a transaction must also have intended that their transaction fall within the scope of Article 9 of the Code. Accordingly, we look to the transaction to determine if the parties intended to create a security interest in the type of property specified in Section 9.102 of the Code for the purpose of securing payment or performance of an obligation. Generally, the test for creation of a security interest under Texas law is whether the transaction was intended to have the effect as security. *Southern Rock, Inc. v. B & B Auto Supply,* 711 F.2d 683, 685 (5th Cir.1983). No formal wording is required, and the Court, in arriving at the intent of the parties, examines the substance of the documents in light of the circumstances of the case. *In re Miller (Looney v. Nuss),* 545 F.2d 916, 918 (5th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977).

Although substance of the document controls over the words used therein, nowhere from the four corners of the Agency Contract can be found any words typically found in a security device, such as "security interest," "collateral," or "security agreement."

The body of law governing agency contracts in Texas has its existence, in part, under TEX.INS.CODE ANN. art. 21.11–1, § 4 (Vernon 1981 & Supp.1992), and the law of contracts. *See generally,* 16B J. APPLEMAN, INSURANCE LAW AND PRACTICE § 9026 (1981). Moreover, the type of transaction made the basis of this suit is quite special, does not fit easily under a general commercial statute, and is adequately covered by the Insurance Code and contract law. "Expirations" do not customarily serve as commercial collateral.

The Associates and Bezdek did not present any summary judgment evidence that even tends to show that the litigants intended to create a security interest. To the contrary, there is deposition testimony that the purpose of transferring the Associates "book of business" to another recording agency was to insure that the customer's policies were serviced.

Nothing in the language of the Agency Contract indicates that the transfer of ownership of the "book of business" was designated to secure payment of the Associates' obligations to the Insurers. The Insurers had an obligation to its insureds to service their policies, and that is accomplished by working the "expirations" through an insurance agent.

The term "book of business" is also known in the insurance industry as "expirations." *In re Corning,* 108 A.D.2d 96, 488 N.Y.S.2d 477, 480 (N.Y.App.Div.1985).

'Expirations' in the insurance field has a definite and well recognized meaning; it embodies the records of an insurance agency for which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance. This information enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements.

It has been determined that this information is of vital assistance to the insurer, as well as the local agency in carrying on the insurance business and it is recognized in the insurance field as a valuable asset in the nature of good will. *V.L. Phillips & Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.,* 199 F.2d 244, 246 (4th Cir.1952), *cert. denied,* 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342 (1953). *Cottingham v. Engler,* 178 S.W.2d 148 (Tex.Civ.App.—Dallas 1944, no writ).

It follows then, from TEX.INS.CODE ANN. art. 21.11–1 (Vernon 1981 & Supp.1992), from the exclusion language of § 9.104(6) of the Code, from lack of intent to create a security interest, and by the divergent definitions of "accounts" and "expirations" that this transaction is not governed by Article 9 of the Code. The point is overruled and the judgment of the trial court is affirmed.