**MORGAN BUILDINGS AND SPAS, INC., Appellant,**

v.

**TURN–KEY LEASING, LTD., Appellee.**

No. 05–02–00819–CV.

Court of Appeals of Texas, Dallas.

Feb. 5, 2003.

Clifton T. Hutchinson, Hughes & Luce, L.L.P., Dallas, for appellant.

Kirk E. Crutcher, Amarillo, for appellee.

Before Justices MOSELEY, LANG, and LAGARDE.[1]

**OPINION**

Opinion by Justice LANG.

Morgan Buildings and Spas, Inc. ("Morgan") appeals the summary judgment rendered against it in favor of Turn–Key Leasing, Ltd. ("Turn–Key"). Morgan brings forth two issues asserting the trial court erred in granting Turn–Key's motion for partial summary judgment because (1) Turn–Key's purported foreclosure on Morgan's partnership interest failed to comply with the provisions of the Texas version of Uniform Commercial Code ("U.C.C." or "the Code") Article Nine [2] and is therefore invalid and void, and (2) numerous fact issues preclude the entry of summary judgment. For reasons stated below, we resolve Morgan's first issue in its favor, reverse the trial court's decision, and remand this cause for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1993, Morgan and Turn–Key formed a joint venture (the "partnership") by entering into a joint venture agreement (the "JVA") for the limited purpose of acquiring, owning, leasing, financing, and selling modular buildings. In late 2000, Morgan experienced a cash flow shortage and consulted Turn–Key about a distribution from the partnership. Michael Borger, Turn–Key's president, proposed a loan from Turn–Key to Morgan as opposed to having the partnership pay distributions. Morgan agreed to Turn–Key's proposed loan.

On January 9, 2001, Turn–Key lent Morgan $450,000. Morgan, in turn, signed a promissory note and a security agreement. The promissory note was scheduled to mature on June 15, 2001 and described the collateral securing its payment as a "security interest created in a security agreement that covers [Morgan's] right, title, and interest in and to" the partnership. The security agreement classified the collateral as "general intangibles" and described it as: "All of [Morgan's] interest in and to [the partnership] under [the JVA] ... together with all income and distributions from the [partnership] (whether upon the dissolution and winding up of the [partnership] or otherwise); all of the foregoing, whether now owned or hereafter acquired and the proceeds thereof."

Contemporaneous with the execution of the promissory note and security agree-

1. The Honorable Sue Lagarde, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

2. Substantial revisions to Chapter Nine of the Texas Business and Commerce Code were made during the 76th Legislature. *See* Act of June 18, 1999, 76th Leg., R.S., Ch. 414, § 1.01, 1999 Tex. Gen. Laws 2639–2736. These amendments took effect on July 1, 2001. All references to the Business and Commerce Code or the Uniform Commercial

Code (U.C.C.) in this opinion are to the version that existed prior to the 1999 revisions because the applicable agreements in this case were entered into before the revisions took effect. For convenience, citation in the text will refer to the relevant provisions of the sections as they existed under the previous version of Article Nine, while the correct citation of these repealed sections will be included, where appropriate, in footnotes.

ment, Morgan and Turn–Key executed an amendment to their 1993 JVA (the "amended agreement"). This amended agreement changed paragraph 14 of the 1993 JVA entitled "Limitation on Transfer." [3]

As the scheduled maturity date of June 15, 2001 approached, Morgan contacted Turn–Key to seek an extension of the loan until December 31, 2001. The parties discussed an extension but reached no agreement. On June 21, Turn–Key wrote a letter to Morgan notifying it of Turn–Key's decision not to renew and extend the loan. The June 21 letter stated that the $450,000 loan, which had become due and payable six days earlier, would now need to be repaid no later than June 28, 2001. Morgan claims its efforts to contact Turn–Key after receipt of the June 21 letter were unsuccessful.

On June 29, 2001, Turn–Key sent another letter to Morgan stating that it considered Morgan to be in default. The letter also notified Morgan that, in accordance with the terms of the amended agreement, the following actions had already taken place: (1) Morgan's interest in the partnership passed to Turn–Key; (2) Turn–Key reduced Morgan's capital account by the amount of the principal, interest, and attorney's fees (totaling $455,384.93); (3)

Turn–Key increased its own capital account in the same amount by which it reduced Morgan's capital account; and (4) Turn–Key adjusted the distributive shares of the partnership in the same proportion as the adjusted capital accounts. Turn–Key also informed Morgan that it remained liable to Turn–Key for the deficiency of the loan in the amount of $112,124.71. Furthermore, the June 29 letter stated that, notwithstanding Turn–Key's exercise of its rights under the amended agreement, Turn–Key intended that (1) the indebtedness evidenced by the promissory note had not been cancelled or extinguished, and (2) the security interest created by the security agreement was not released and was to remain "valid and in full force against the collateral." Finally, Turn–Key informed Morgan that the security interest created by the security agreement would continue to be effective and would be reinstated if at any time payment or reduction of all or any part of the indebtedness evidenced by the promissory note was "rescinded or must otherwise be returned by Turn–Key, as though such payment or reduction had not been made."

On July 11, 2001, Morgan wrote to Turn–Key. Morgan said that Turn–Key's June 29 letter appeared to propose that

---

3. The 1993 JVA provided that no partner could "sell, assign, transfer, encumber, or otherwise dispose of" any interest in the partnership. The amended agreement, however, provided the following:

It is understood and agreed that a partner may encumber all or a part of its interest in the joint venture to another partner to secure performance of an obligation to that partner. The terms of such pledge, including events of default, must be in a writing signed by the partners. In the event of default which allows foreclosure on the pledged interest, title of the pledged joint venture interest shall immediately pass according to this paragraph. Title shall pass by adjusting the capital accounts defined in

Paragraph 11 of this Agreement by reducing the capital account of the defaulting partner by the amount of the default and by increasing the capital account of the non-defaulting partner by the same amount. In the event such an adjustment to the capital account occurs, the distributive share of each partner pursuant to Paragraph 12 will be adjusted so that the pro rata distributive shares will be allocated in the same proportion as the capital accounts after adjustment. In the event the default amount exceeds the defaulting partner's capital account balance, the partner's joint venture interest will terminate, and the defaulting partner shall remain liable for the excess amount.

Turn–Key retain Morgan's partnership interest in satisfaction of all or any portion of the note. Morgan protested any such retention of Morgan's partnership interest. Rather, Morgan stated that because of its objection, Turn–Key was compelled to dispose of the interest in accordance with the applicable provisions of the Texas U.C.C. Then, Morgan reserved the right to hold Turn–Key liable for any losses caused by Turn–Key's failure to comply with the U.C.C.

Morgan filed suit on July 9, 2001, claiming, *inter alia,* that Turn–Key's attempted retention[4] of Morgan's partnership interest in partial satisfaction of Morgan's debt was void. Morgan alleged that both the terms of the amended agreement and Turn–Key's actions violated the advance notice and commercially reasonable disposition requirements of sections 9.504 and 9.505 of Article Nine. Turn–Key filed a motion for partial summary judgment on December 26, 2001.[5] Morgan then filed its own motion for partial summary judgment on February 22, 2002.[6] On March 21, 2002, the trial court granted Turn–Key's motion for partial summary judgment without specifying the grounds. Morgan non-suited its remaining claims,[7] and this appeal followed.

On appeal, Morgan argues the trial court erred in granting Turn–Key's motion for partial summary judgment because (1) Turn–Key's purported foreclosure on Morgan's partnership interest failed to comply with the provisions of Texas's U.C.C. Article Nine and is therefore invalid and void, and (2) numerous fact issues preclude the entry of summary judgment. Although Morgan raises two issues, both center on whether the provisions of the amended agreement and the actions in disposition or retention of the partnership account and/or its partnership interest are governed by the U.C.C. If we were to find that the U.C.C. does not govern, Morgan's contention as to the existence of fact issues would be of no merit, since any such fact issues hinge on its claim that the U.C.C. applies to this transaction. However, if we were to find that the U.C.C. does apply, then the case should be reversed and remanded

4. By its actions in adjusting the partnership interests and capital accounts in its favor, Morgan claimed that Turn–Key had "retained" the collateral as that term is used under Article Nine. However, at oral argument of this appeal, Morgan indicated that Turn–Key had since sold (i.e., "disposed" of) a portion of the partnership to a third party. There is no evidence in the record regarding the sale of any portion of the partnership to a third party.

5. Turn–Key moved for partial summary judgment on Morgan's claims for (1) breach of the JVA; (2) breach of the duty of loyalty; (3) usurpation of partnership opportunity; (4) wrongful foreclosure; (5) unreasonable disposition of partnership assets; (6) impermissible foreclosure; (7) impermissible winding up of the partnership; (8) injunctive relief requiring Turn–Key to continue the partnership; (9) injunctive relief preventing Turn–Key from disposing of partnership assets; and (10) injunctive relief preventing Turn–Key from using the partnership name.

6. Morgan moved for partial summary judgment on the grounds that (1) Turn–Key's notice was untimely; (2) Turn–Key could not retain the collateral; (3) Turn–Key's disposition of the collateral was unreasonable; (4) Turn–Key could not retain the collateral and claim a deficiency; (5) the advance notice and commercially reasonable disposition requirements of the Texas U.C.C. could not be waived; and (6) Turn–Key's attempted transfer of its partnership interest was invalid.

7. The claims Morgan non-suited were its request for an accounting, its request for a winding up of the partnership, and "other declaratory relief" regarding the applicability of the U.C.C. to the Turn–Key foreclosure. These claims are not before us, and we do not address their merits.

for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

The standards for reviewing summary judgment under rule 166a(c) are well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Orozco v. Dallas Morning News, Inc.*, 975 S.W.2d 392, 394 (Tex.App.-Dallas 1998, no pet.). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied); *West End Pink, Ltd. v. City of Irving*, 22 S.W.3d 5, 7 (Tex.App.-Dallas 1999, pet. denied) (citing *Keever v. Finlan*, 988 S.W.2d 300, 305 (Tex.App.-Dallas 1999, pet. dism'd)).

## U.C.C. ARTICLE NINE GOVERNING SECURED TRANSACTIONS

### A. Applicable Law

▮ Article Nine of the U.C.C. applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts."[8] Generally, the test for creation of a security interest is whether the transaction was intended to have the effect as security, because parties must have intended that their transaction fall within the scope of Article Nine. *Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc.*, 880 S.W.2d 67, 71 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (citing *John Bezdek Ins. Assocs., Inc. v. Am. Indem. Co.*, 834 S.W.2d 401, 403 (Tex.App.-San Antonio 1992, no writ)). Accordingly, we look to the transaction to determine if the parties intended to create a security interest in the type of property specified in section 9.102 of the Code for the purpose of securing payment or performance of an obligation. *John Bezdek Ins.*, 834 S.W.2d at 403. No formal wording is required, and the court, in arriving at the intent of the parties, should examine the substance of the documents in light of the circumstances of the case. *Id.* (citing *In re Miller*, 545 F.2d 916, 918 (5th Cir.1977) (applying Texas law)). We determine the true intention of the parties by examining "the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) (emphasis omitted). Finally, documents executed contemporaneously for the same purpose and as part of the same transaction should be read and construed together to determine the intent of the parties. *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex.1981).

▮ Section five of Article Nine governs the rights and duties of secured parties and debtors in the event of default. Section 9.504 gives a secured party the right to sell or dispose of collateral after the debtor's default, while section 9.505 gives the secured party the right to retain the collateral in satisfaction of the debtor's obligation. However, advance notice of either means of disposition must be given by the secured party. *See Tanenbaum v. Econ. Lab., Inc.*, 628 S.W.2d 769, 771 (Tex. 1982); *Acuff v. Lamesa Nat'l Bank*, 919 S.W.2d 154, 156 (Tex.App.-Eastland 1996, no writ).

**8.** Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–102, 1965 Tex. Gen. Laws 151, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.102, 1967 Tex. Gen. Laws 2520, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 999, *amended by* Act of June 18, 1997, 75th Leg., R.S., ch. 930, § 1, 1997 Tex. Gen. Laws 2926–27 (current version at TEX. BUS. & COM. CODE ANN. § 9.109 (Vernon Supp.2003)).

Section 9.504(c) governs a secured party's right to dispose of collateral after default by the debtor. It states: "Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts.... [B]ut every aspect of the disposition including the method, manner, time, place, and terms must be *commercially reasonable.*"[9] Section 9.504 describes the "advance notice" requirement as follows:

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, *reasonable notification* of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed *after default* a statement renouncing or modifying his right to notification of sale.[10]

A secured creditor, however, may elect not to dispose of the collateral. Section 9.505 allows a creditor to retain collateral in complete satisfaction of the indebtedness once it notifies the debtor of its intent. "Written notice of such proposal shall be sent to the debtor if he has not signed *after default* a statement renouncing or modifying his rights under this subsection.... If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9.504."[11]

Finally, section 9.501(c) states that certain provisions relating to the disposition and retention of collateral may not be waived, but that the parties may agree to "not manifestly unreasonable" standards as to fulfillment of those rights and duties. Specifically, that section provides:

> [T]he rules stated in the subsections below *may not be waived* or varied ... but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured *if such standards are not manifestly unreasonable:*
>
> ....
>
> (2) Subsection (c) of Section 9.504 and Subsection (a) of Section 9.505 which deal with disposition of collateral;
>
> (3) Subsection (b) of Section 9.505 which deals with acceptance of collateral as discharge of obligation.[12]

**9.** Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–504(3), 1965 Tex. Gen. Laws 176, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.504(c), 1967 Tex. Gen. Laws 2550, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 1028, *amended by* Act of June 19, 1975, 64th Leg., R.S., ch. 353, § 8, 1975 Tex. Gen. Laws 942–43, *amended by* Act of May 20, 1977, 65th Leg., R.S., ch. 163, § 4, 1977 Tex. Gen. Laws 334 (current version at TEX. BUS. & COM.CODE ANN. § 9.610 (Vernon Supp.2003)) (emphasis added).

**10.** *Id.* (emphasis added).

**11.** Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–505, 1965 Tex. Gen. Laws 177, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.505, 1967 Tex. Gen. Laws 2551, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 1029, *amended by* Act of June 19, 1975, 64th Leg., R.S., ch. 353, § 9, 1975 Tex. Gen. Laws 943, *amended by* Act of May 20, 1977, 65th Leg., R.S., ch. 163, § 6, 1977 Tex. Gen. Laws 334 (current version at TEX. BUS. & COM.CODE ANN. § 9.620 (Vernon Supp.2003)) (emphasis added).

**12.** Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–501(3), 1965 Tex. Gen. Laws 174, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.501(c), 1967 Tex. Gen. Laws 2548, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen.

### B. Application of Law to the Facts

#### 1. Security Agreement or Alternative Means of Payment?

■ Morgan claims that the substance of the amended agreement creates a security interest that is governed by Article Nine. In that regard, Morgan points to the language of the amended agreement, which, among other things, reflects the intent of the parties by authorizing a partner to "encumber" its partnership interest to "secure performance" of an obligation to that partner. The terms of such "pledge," including events of "default," must be in a writing signed by the partners. Further, the amended agreement provides that any "pledged interest" will immediately pass upon any event of default by adjusting the partners' capital accounts such that any debt is *automatically* offset by the defaulting party's capital account. If the amount of the debt due and unpaid exceeds the defaulting party's capital account, that partner's interest terminates, and the defaulting partner remains liable for the excess amount.

Turn–Key consistently argues its actions should not be governed by the U.C.C. The primary reason it cites is that the amended agreement authorized an alternate method of payment and, as a result, it was not limited to enforcement of its security inter-

est under Article Nine. Thus, Turn–Key asserts it had two options after Morgan defaulted: (1) it could have foreclosed on its security interest subject to the security agreement and thus could have been subject to both the duties and protections of Article Nine, *or* (2) it could have simply adjusted the capital accounts by the amount of the debt and then could have sued Morgan for the deficiency, as provided under the terms of the amended agreement. As evidence of its election to pursue the latter option, Turn–Key directs us to its June 29 letter, which informed Morgan that Turn–Key reserved all its rights under the security agreement since it had elected to proceed under the amended agreement. Hence, Turn–Key concludes that its actions pursuant to the amended agreement would not be an Article Nine foreclosure.

In making its argument, Turn–Key cites us to the Texas Revised Partnership Act (TRPA),[13] which it asserts governs this transaction to the exclusion of Article Nine of the U.C.C. Specifically, Turn–Key cites article 6132b–4.01(c), which provides that a partner who makes a payment or advance on behalf of the partnership is entitled to reimbursement by the partnership. *See* Tex.Rev.Civ. Stat. Ann. art. 6132b–4.01(c) (Vernon Supp.2003).[14] Turn–Key informs this Court in its brief that we should not

Laws 1026 (current version at Tex. Bus. & Com.Code Ann. § 9.602 (Vernon Supp.2003)) (emphasis added).

**13.** The Texas Revised Partnership Act, Tex. Rev.Civ. Stat. Ann. art. 6132b–1.01 to –11.04 (Vernon Supp.2003), applies to partnerships formed on or after January 1, 1994 and to those partnerships formed before that date that elect to be governed by the new act. *Id.* art. 6132b–11.03(a)(1). In this case, the 1993 JVA specifically provides that the parties' agreement was subject to the Texas Uniform Partnership Act, which preceded the Revised Partnership Act. Although Turn–Key makes no assertion that the parties here ever elected

to be governed by the Revised Partnership Act, we assume for the sake of considering Turn–Key's argument, without so deciding, that the relevant provisions of the Revised Partnership Act are applicable to the Morgan/Turn–Key partnership.

**14.** Notwithstanding the applicability of the Texas Revised Partnership Act, subsection (c) of article 6132b–4.01 is drawn from and quite similar to section 18(1)(c) of the repealed Texas Uniform Partnership Act. *See* Act of May 16, 1961, 57th Leg., R.S., ch. 158, § 18(1)(c), 1961 Tex. Gen. Laws 294, *repealed by* Act of June 19, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3896.

apply Article Nine of the U.C.C. to this transaction unless we are "also prepared to find an irreconcilable statutory conflict between the TRPA and the U.C.C." However, article 6132b–4.01(c) of the TRPA is inapposite to this case because it clearly refers only to transactions between a partner and the partnership itself. Turn–Key conceded as much during its oral argument at the submission of this appeal. We are not cited to any applicable provision of the TRPA that references transactions between partners where the partnership interest of one partner is encumbered, in the words of the amended agreement, "to secure performance of an obligation to that partner." Therefore, we find no irreconcilable statutory conflict between the TRPA and Article Nine as it relates to the facts of this case.

Finding no applicable Texas authority to support its argument, Turn–Key cites us to a decision from the Georgia Court of Appeals in the case of *Consolidated Equities Corp. v. Bird,* 195 Ga.App. 45, 392 S.E.2d 276 (1990). Turn–Key argues that this Georgia case supports its position that the amended agreement is merely an alternate method of payment and not a security agreement governed by Article Nine. Turn–Key suggests that the Georgia case addresses a factual situation similar to that before us.

The court in *Consolidated Equities* found the offset of several defaulting partners' capital accounts to be pursuant to an agreement for "alternate methods of payment" as opposed to a transaction governed by the U.C.C. *Id.* at 278. Although we do find some similarities between the facts recited in the *Consolidated Equities* case and those in the case before us, we read *Consolidated Equities* as distinguishable from the case at bar and decline to follow it. In *Consolidated Equities,* on the one hand, the court pronounced the gener-

al rule that "[a]n agreement for an alternative form of payment does not allow for an indirect evasion by the creditor of the debtor protection provisions of Article Nine." *Id.* Yet, on the other hand, the Georgia court found that since the "alternative method of payment" provided that there would be no claim for deficiency, the protection provisions of Article Nine were not evaded. According to that court's reasoning, the debtor protection provisions of Article Nine were "inapplicable and irrelevant." *Id.* at 278–79. We do not agree with the Georgia court's sweeping statement that Article Nine protections are "inapplicable and irrelevant" in instances where secured parties do not pursue defaulting partners for post-disposition and/or post-retention deficiency claims. Regardless of the Georgia court's reasoning, the amended agreement before us clearly allows for a deficiency claim against the defaulting partner. Even if the provisions of the amended agreement were to be construed by us as an "alternate method of payment," such an agreement could not be allowed to stand if it has even the indirect effect of "evasion ... of the debtor protection provisions of Article Nine." *Id.* at 278.

### 2. Waiver of Debtor Safeguards or Reasonable Modification of Standards?

■■■■ Morgan argues the amended agreement constitutes a waiver of the notice and commercially reasonable requirements for disposition or retention of collateral in violation of the prohibitions of section 9.501(c). Morgan asserts that, at the very least, the amended agreement was an impermissible "manifestly unreasonable" modification of these requirements. Morgan asserts that since the amended agreement provided for absolutely no advance notice of disposition, effectively, there was a waiver of the Article Nine notice requirements. Texas courts

have long prohibited waivers of the Article Nine requirements. *See, e.g., Tanenbaum v. Econ. Lab., Inc.,* 628 S.W.2d 769 (Tex. 1982); *Rabinowitz v. Cadle Co. II, Inc.,* 993 S.W.2d 796 (Tex.App.-Dallas 1999, pet. denied); *Burton v. Nat'l Bank of Commerce of Dallas,* 679 S.W.2d 115 (Tex. App.-Dallas 1984, no writ). Further, Morgan advises that Texas courts have not tolerated waiver of a secured party's obligation to dispose of collateral in a commercially reasonable manner. *See United States v. Terrey,* 554 F.2d 685 (5th Cir. 1977) (applying Texas law); *Rabinowitz,* 993 S.W.2d at 798–99; *O'Neil v. Mack Trucks, Inc.,* 533 S.W.2d 832, 836 (Tex. Civ.App.-El Paso 1975), *rev'd in part on other grounds,* 542 S.W.2d 112 (Tex.1976), *mandate recalled and reissued by* 551 S.W.2d 32 (Tex.1977) (per curiam). Turn–Key responds by arguing that there was no waiver. Alternatively, Turn–Key argues that even if the U.C.C. were to apply, its actions were pursuant to a "modification" authorized by section 9.501(c) that could not possibly be construed as "manifestly unreasonable," since Morgan had already agreed to the "modification" as to the disposition or retention of its partnership interest when it signed the amended agreement.

It is clear from a plain reading of section 9.501(c) that debtors' rights and secured creditors' duties under sections 9.504 and 9.505 may not be waived regarding (1) commercial reasonableness of the disposition of collateral, and (2) advance notice of disposition or retention of collateral. While a debtor and creditor may enter into an agreement that establishes "the standards by which the fulfillment of these rights and duties is to be measured," there is a limit. The proposed "standards" must not be "manifestly unreasonable." [15] The term "manifestly unreasonable" is not defined in the U.C.C., and no Texas case law has addressed the specific issue raised in this case. However, Black's Law Dictionary defines "manifest" as: "Evident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." BLACK'S LAW DICTIONARY 962 (6th ed.1990).[16]

In reasoning toward our decision, and in view of the dearth of legal authority in Texas, we are mindful of the official comments to the various sections of the U.C.C. prepared by the American Law Institute and the National Conference of Commissioners on the Uniform Commercial Code. These comments provide valuable guidance to the meaning and purpose of the Code as enacted in Texas. In particular, we note that comment four to section 9.501 makes it abundantly clear that debtors' rights after default are to be carefully protected. It states: "In the area of rights after default our legal system has traditionally looked with suspicion on agreements designed to cut down the debtor's rights and free the secured party of his duties. . . . The default situation offers great scope for overreaching; the suspicious attitude of the courts has been grounded in common sense." [17]

---

**15.** *See* § 9.501(c), *supra* note 12 (current version at TEX. BUS. & COM.CODE ANN. § 9.603 (Vernon Supp.2003)).

**16.** Dictionary definitions can be utilized by courts in construing the plain meaning of words. *See* TEX. GOV'T CODE ANN. § 311.011 (Vernon Supp.2003) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

**17.** *See* § 9.501(c), *supra* note 12, at cmt. 4 (current version at TEX. BUS. & COM.CODE ANN. § 9.602 cmt. 2 (Vernon Supp.2003)).

### Conclusion

Turn–Key's argument that the amended agreement is merely an alternative means of payment, exempt from the U.C.C. as found in the *Consolidated Equities* case, is simply not persuasive. The amended agreement does not stand alone. It simply authorizes a partner to "encumber" its partnership interest to "secure performance of an obligation" to another partner. The amended agreement imposes the requirement that a "pledge, including events of default," be in writing and authorizes "foreclosure" upon occurrence of an "event of default." Then, fitting neatly with the amended agreement, the security agreement effects a "pledge" of Morgan's partnership interest to "secure" the repayment of the sum due to be paid pursuant to the note, while the note and security agreement specify the "events of default." It is clear that the promissory note and security agreement, executed contemporaneously with the amended agreement, supply terms required for the operation of the disposition provisions in the amended agreement.

The plain intention of the parties found in the complementary provisions of the documents is that the amended agreement was created to authorize a security interest and provide an alternative means of foreclosure or disposition upon default. Hence, we conclude that Article Nine of the U.C.C. applies to the amended agreement and to Turn–Key's actions under the provisions of the amended agreement.[18]

Because Article Nine of the U.C.C. applies, we find that Turn–Key's reliance on the amended agreement is unavailing to excuse it from failing to provide advance notice. We hold that the amended agreement is not enforceable to vary the requirement of advance notice under Article Nine since any such omission is violative of section 9.501(c) and the time honored prohibition of waiver of advance notice of the disposition or retention of collateral. *See Tanenbaum,* 628 S.W.2d at 772. Additionally, we hold that Turn–Key is not excused from its obligations of commercially reasonable disposition of the collateral based upon the provision of the amended agreement providing for an offset of the partnership account as the sole means of disposing of or retaining the collateral. That provision of the amended agreement, in substance, effects an unlawful waiver by the debtor of the secured party's obligation to dispose of the collateral in a commercially reasonable manner.[19]

Finally, we conclude that even if the "offset provision" was intended by the parties to define the "standards" for compulsory disposition or retention of collateral, including advance notice, under sections 9.504 and 9.505, those "standards" were and are "manifestly unreasonable" in light of the prohibition of waiver of those provisions. Accordingly, the "offset provision" fails to vary the rights and obligations of the parties as a matter of law.

We reverse the trial court's judgment and remand this cause for further proceedings consistent with this opinion.

---

**18.** *See* § 9.102(a), *supra* note 8 (current version at Tex. Bus. & Com.Code Ann. § 9.109 (Vernon Supp.2003)); *see also John Bezdek Ins.,* 834 S.W.2d at 403.

**19.** *See* § 9.501(c), *supra* note 12 (current version at Tex. Bus. & Com.Code Ann. § 9.603 (Vernon Supp.2003)); *see also Rabinowitz,* 993 S.W.2d at 798–99.