Opinion issued August 31, 2007




















In The

Court of Appeals

For The

First District of Texas






NO. 01-04-01185-CV

 __________


EXCEL AUTO AND TRUCK LEASING, LLP., Appellant


V.


ALIEF INDEPENDENT SCHOOL DISTRICT, CHARTERWOOD
MUNICIPAL UTILITY DISTRICT, CHELFORD ONE MUNICIPAL
UTILITY DISTRICT, CIMARRON MUNICIPAL UTILITY DISTRICT,
CITY OF BAYTOWN, CITY OF DEER PARK, CITY OF HOUSTON, CITY
OF KATY, CITY OF PASADENA, CLEAR BROOK CITY MUNICIPAL
UTILITY DISTRICT, CY-CHAMP PUBLIC UTILITY DISTRICT,
CYPRESS-FAIRBANKS INDEPENDENT SCHOOL DISTRICT, DEER
PARK INDEPENDENT SCHOOL DISTRICT, FALLBROOK UTILITY
DISTRICT, GOOSE CREEK CONSOLIDATED INDEPENDENT SCHOOL
DISTRICT, HARRIS COUNTY, HARRIS COUNTY EDUCATION
DEPARTMENT, HARRIS COUNTY EMERGENCY SERVICE DISTRICT
NO. 1, HARRIS COUNTY EMERGENCY SERVICE DISTRICT NO. 7,
HARRIS COUNTY EMERGENCY SERVICE DISTRICT NO. 9, HARRIS
COUNTY EMERGENCY SERVICE DISTRICT NO. 28, HARRIS COUNTY
FLOOD CONTROL DISTRICT, HARRIS COUNTY FORT BEND
EMERGENCY SERVICE DISTRICT NO. 100, HARRIS COUNTY
HOSPITAL DISTRICT, HARRIS COUNTY MUNICIPAL UTILITY
DISTRICT NO. 33, HARRIS COUNTY MUNICIPAL UTILITY DISTRICT
NO. 38, HARRIS COUNTY MUNICIPAL UTILITY DISTRICT NO. 64,
HARRIS COUNTY MUNICIPAL UTILITY DISTRICT NO. 81, HARRIS
COUNTY MUNICIPAL UTILITY DISTRICT NO. 120, HARRIS COUNTY
MUNICIPAL UTILITY DISTRICT NO.132, HARRIS COUNTY
MUNICIPAL UTILITY DISTRICT NO. 158, HARRIS COUNTY RURAL
FIRE PREVENTION DISTRICT NO. 13, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 16, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 17, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 20, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 24, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 25, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 26, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 29, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 46, HARRIS COUNTY RURAL FIRE
PREVENTION DISTRICT NO. 48, HARRIS COUNTY UTILITY
DISTRICT NO. 6, HARRIS COUNTY WATER CONTROL AND
IMPROVEMENT DISTRICT NO. 113, HARRIS COUNTY WATER
CONTROL AND IMPROVEMENT DISTRICT NO. 132, HARRIS COUNTY
WATER CONTROL AND IMPROVEMENT DISTRICT NO. 133,
HORSEPEN BAYOU MUNICIPAL UTILITY DISTRICT, HOUSTON
COMMUNITY COLLEGE DISTRICT, HOUSTON INDEPENDENT
SCHOOL DISTRICT, HUMBLE INDEPENDENT SCHOOL DISTRICT,
KATY INDEPENDENT SCHOOL DISTRICT, KLEIN INDEPENDENT
SCHOOL DISTRICT, LAKE FOREST UTILITY DISTRICT, LEE
COLLEGE DISTRICT, LOUETTA NORTH PUBLIC UTILITY DISTRICT,
NORTH BELT UTILITY DISTRICT, NORTH FOREST INDEPENDENT
SCHOOL DISTRICT, NORTH HARRIS MONTGOMERY COMMUNITY
COLLEGE DISTRICT, NORTHPARK PUBLIC UTILITY DISTRICT,
NORTHWEST HARRIS COUNTY MUNICIPAL UTILITY DISTRICT NO.
16, PASADENA INDEPENDENT SCHOOL DISTRICT, PONDEROSA
FOREST UTILITY DISTRICT, PORT OF HOUSTON AUTHORITY OF
HARRIS COUNTY, RANKIN ROAD WEST MUNICIPAL UTILITY
DISTRICT, SAGEMEADOW UTILITY DISTRICT, SAN JACINTO
COMMUNITY COLLEGE DISTRICT, SPRING BRANCH INDEPENDENT
SCHOOL DISTRICT, SPRING INDEPENDENT SCHOOL DISTRICT,
TIMBER LANE UTILITY DISTRICT, WEST HARRIS COUNTY
MUNICIPAL UTILITY DISTRICT NO. 6, Appellees






On Appeal from the 11th District Court

Harris County, Texas

Trial Court Cause No. 2002-03788






OPINION CONCURRING IN THE JUDGMENT AND DISSENTING
FROM DENIAL OF REHEARING


 I concur in the judgment and I dissent from denial of appellant/taxpayer Excel
Auto & Truck Leasing, L.L.P.'s ("Excel"'s or "Excel Auto"'s) motion for rehearing. 
This suit for delinquent ad valorem taxes is important both as a tax case and as a case
of first impression in Texas regarding the distinction between a lease and a security
agreement under section 1.203 of the Uniform Commercial Code (UCC), codifying
former section 1.201(37) of the Code. The issue is whether Excel, a motor vehicle
leasing company, is the owner for ad valorem tax purposes of the vehicles it leases
or whether the lessees of the vehicles are the owners and responsible for the taxes. 
Excel argues that its "Motor Vehicle Leasing Agreement" ("Lease" or "Agreement")
is, as a matter of economic reality, a security agreement executed in connection with
its financing of the purchase of the vehicles by the lessees and that, therefore, they,
not it, are the owners of the vehicles for tax purposes.

 Our April 19, 2007 judgment affirmed the trial court's summary judgment in
favor of the various taxing units, appellees, on the ground that the Lease Agreement
was a lease, and not a mere security agreement, and that, therefore, Excel was the
owner of the vehicles for ad valorem tax purposes. In its motion for rehearing, Excel
contends that we erred in construing the Lease Agreement as a lease rather than as a
security agreement and, therefore, in affirming its liability for ad valorem taxes that
are properly chargeable to its lessees. In response, the majority has withdrawn the
April 19 opinion and substituted a new opinion explaining the basis for its
conclusion. The panel continues to affirm summary judgment in favor of the taxing
authorities. Because I disagree with the majority's reasoning, but agree with its
conclusion, I concur in the judgment only.

"Ownership" for Tax Purposes

 The issue in this case is the ownership for ad valorem tax purposes of the
vehicles Excel leases. The majority bases its conclusion that Excel is the owner of
the leased vehicles on its determination that Excel is not a lienholder. See Comerica
Acceptance Corp. v. Dallas Cent. Appraisal Dist., 52 S.W.3d 495, 497 (Tex.
App.--Dallas 2001, pet. denied) (lienholder is not owner of property within"the
common meaning of that term"). The majority does not address the construction of
the term "owner" under the Tax Code, which I would deem to be the controlling
issue.

 All tangible personal property, including motor vehicles, is taxable unless
exempted by law. See Tex. Tax Code Ann. § 11.01 (Vernon 2001). A person is
entitled to an exemption from taxation of personal property that is not used for the
production of income. Id. § 11.14 (Vernon Supp. 2006). The leased vehicles are
used by Excel, but not by its lessees, for the production of income. Indeed, the Lease
specifically provides that the lessee agrees "not to use the Vehicle as a taxi or for
other public or private hire or delivery." (1) The person who owns the property on
January 1 of the tax year is the person liable for the tax. Tex. Tax Code Ann. §
32.07 (Vernon Supp. 2006). Vehicle registration records in this case show that
appellant, Excel Auto, is the title owner of the vehicles and that Excel Lease Fund,
Inc. is the lien holder.

 For purposes of construing the ad valorem tax statutes, an "owner" of property
has been construed as "a person or entity holding legal to the property, or holding an
equitable right to obtain legal title to the property." Comerica Acceptance, 52 S.W.3d
at 497. Equitable title is the present right to compel legal title. Travis Cent. Appraisal
Dist. v. Signature Flight Support Corp., 140 S.W.3d 833, 840 (Tex. App.--Austin
2004, no pet.); Comerica, 52 S.W.3d at 497-98. Generally, the person having legal
title to the property, or the equivalent, is considered to be the owner for taxation
purposes. See Childress County v. State, 92 S.W.2d 1011, 1015 (Tex. 1936); General
Elec. Capital Corp. v. City of Corpus Christi, 850 S.W.2d 596, 599 (Tex.
App.--Corpus Christi 1993, writ denied) (explaining that taxing entity may impose
ad valorem taxes on secured party in possession or with right of possession even
though actual legal title is not party's name; for ad valorem tax purposes, secured
party in possession is equivalent of title owner). 

 Here, the Lease Agreement provides that Excel retains title to the leased
vehicles until the purchase option is exercised. Lessees have no present right to
compel Excel to transfer title to them. Rather, they can compel transfer of title only
by fulfilling conditions set by Excel for early termination of the lease and purchase
of the vehicle or by completing the lease payments and exercising the option to buy
the vehicle for $4,000. Even at the end of the lease term, the option must have been
granted, Excel must not have declared the lease payments in default, and the lessee
must have given Excel 30 days notice. Thus, since the lessees are neither the legal
title owners nor the equitable owners of the vehicles leased to them by Excel, the
owner for ad valorem tax purposes is Excel. See Signature Flight Support, 140
S.W.3d at 841 ("Here, the lease agreements clearly and unambiguously state that the
City holds legal title to the improvements after it accepts them. Appellees do not
have equitable title, for they have no grounds to compel the City to give them legal
title; they may merely operate and use the facilities in accordance with the lease
terms."). I would, therefore, affirm the summary judgment entered in favor of the
taxing units.


The Motor Vehicle Leasing Agreement

 Excel contends, however, that we should determine ownership of the vehicles
for tax purposes by reference to the nature of its transaction with its lessees, not by
either equitable or title ownership of the vehicles. It contends that we should look
beyond the titleholder (Excel itself) and construe the Lease not as a lease but as a
disguised security interest it holds to secure the lessees' payment of the full
consideration of the vehicles pursuant to its sale of the vehicles to them. It contends
that Section 1.203 of the Texas UCC, which distinguishes a security interest from a
lease, controls this case. It further contends, in its motion for rehearing, that we did
not properly construe Section 1.203 and, therefore incorrectly held that the Lease
Agreement was a lease and not a mere security interest. 

 I disagree with Excel that the issue of whether its leases are true leases or
security interests is controlling for tax purposes. However, because the issue of
whether the Lease Agreement is a disguised security interest or a true lease is raised
by Excel as an affirmative defense and addressed by the majority, and because this
issue is important to business relationships within the scope of the UCC, I address it
below. (2) I would hold that the Lease Agreement is a true lease and that Excel is the
owner of the vehicles for UCC purposes as well as for ad valorem tax purposes,
although I would not analyze the law the same way the majority does.

Excel's "Motor Vehicle Lease Agreement"

 Excel's Lease Agreement provides:

 23. LEASE TERMINATION: This Lease will end ("terminate")
when one of the following events occurs, whichever happens
first: (a) You choose to end this Lease early and return the
Vehicle to us; . . . On termination you will pay the amounts
agreed in this Lease. You are not entitled to keep the Vehicle
past the end of the scheduled Lease term or the date of early
termination without our prior consent.


 24. EARLY TERMINATION: This section applies if the Lease
terminates before the end of the scheduled Lease term. . . . On
early termination, you will return the Vehicle to us. You will
deliver it to our address or to another reasonable location at our
request.


 (a) Early Termination Liability. On early termination, you

 agree to pay us:


 (1) A VEHICLE RETURN FEE, if any, given in section
28(b);


 (2) All accrued and unpaid amounts that are due or past
due at that time . . . ;


 (3) The amount by which the "Adjusted Lease Balance"
is greater than the "Realized Value: [sic] of the
Vehicle. . . . and;


 (4) All official fees and taxes imposed in connection
with the Lease termination.


(emphasis in original).

 The Lease thus provides that the lessee may terminate the lease at any time
upon compliance with its terms. Upon termination of any sort, the lessee "will pay
the amounts agreed in this lease," and he must return the vehicle unless he has the
option to purchase it. Upon early termination, the lessee must deliver the vehicle to
Excel together with (1) a vehicle return fee; (2) all due and past due unpaid accrued
amounts for use of the vehicle; (3) "[t]he amount by which the "Adjusted Lease
Balance" is greater than the "Realized Value: [sic] of the Vehicle"; and (4) "[a]ll
official fees and taxes imposed in connection with the Lease termination." (3) If the
lease is not in default after a specified number of months (30 months of the 60 month
lease), the lessee has the option to purchase the vehicle by paying all fees, taxes, and
other costs incurred for the purchase and all other fees and charges due or past due
under the lease, plus the Adjusted Lease Balance. Under the terms of the Lease, the
lessee's Base Monthly Payment is applied first to reduce the "Rent Charge," "in a
way," the Lease states, "that is similar to interest for loans." The remainder is applied
to reduce the Adjusted Lease Balance. Thus, "[a]t any given time, the Adjusted Lease
Balance is equal to: (1) the Vehicle's Residual Value. . . , plus (2) the total of all
remaining unpaid Base Monthly Payments, minus (3) the amount of the unearned
Rent Charge at that time." (emphasis added). The lessee agrees to pay a Vehicle
Return Fee of $4,000 if the Lease is terminated before the end of the Lease term and
the vehicle is returned, but not if he purchases the vehicle. If the lessee has an option
to purchase the vehicle, he may exercise the option at the end of the Lease term for
$4,000 if Excel has not declared the lease payments in default and the lessee has
given Excel 30 days notice. 

 Additionally, the Lease provides that the lessee assumes the risk of any loss or
damage to the vehicle and the risk of theft or total loss of the vehicle. The leased
vehicle conveys no warranties by Excel. The lessee agrees to pay all maintenance and
operating costs. Finally, the Lease provides:

 TITLING, OFFICIAL FEES AND TAXES: You understand and agree that
this agreement is a lease only. We own the Vehicle and it will be titled in our
name or in the name of our assignee. You have no ownership interests in the
Vehicle except for any future option to purchase provided in this Lease. You
agree to pay all title, registration, license, sales, use, excise, personal
property, ad valorem, inspection, testing, and all other taxes, fees and
charges imposed by government authorities in connection with the Vehicle
and this Lease during the Lease term, except our income taxes. . . .

(emphasis in original). There is no option to renew the Lease.

 A sample completed Lease form taken from the record and attached to
appellant's brief shows a lease dated March 20, 2002 for a used Mercedes Benz 2001
model S55 AMG. The agreed upon value of the vehicle is $115,516.20, which, after
Capitalized Cost Reduction of $47,243.99 (including $53,000 paid at signing), yields
an Adjusted Capitalized Cost of $68,272.21, which is used for calculating Base
Monthly Payments. In addition to the down payment of $53,000, the lessee must
make total monthly payment of $1,756.01, so that by the end of the 60-month lease
period the lessee will have paid $152,604.59.

 In sum, although Excel's customers have possession and use of the vehicles
and insure and maintain them, Excel possesses legal title to the vehicles, maintains
a lien on them, and passes through taxes to the lessees. The lessees must make all
agreed payments as specified in the lease, either to retain possession and use of the
vehicle or to purchase it. Payments go first to pay down "interest" costs and
afterwards to satisfy the realized value of the vehicle. The lessees bear all costs of
maintenance, insurance, and loss. They have no legal title to the vehicles, as the
Lease informs them, and, according to the Lease, no ownership rights. Rather, to
obtain legal title to the vehicles and ownership, the lessees must comply with all
terms of the Lease and, in addition, pay costs of purchase as determined by Excel,
plus the Adjusted Lease Balance as determined by Excel. Alternatively, they may
complete the Lease term and purchase the vehicles for $4,000 if the purchase option
has been granted them, they are not in default, and they have given notice to Excel. 
The vehicles retain residual value at the end of the lease term and must be returned
to Excel unless the purchase option is exercised. 

 The question for this Court is whether Excel's Lease Agreement is a lease or
whether it is a security agreement attendant on the contingent sale of the vehicles to
the lessees under the terms of UCC Section 1.203. 

UCC Section 1.203

 Under the UCC, a lease is "a transfer of the right to possession and use of
goods for a term in return for consideration, but a sale . . . , or retention or creation
of a security interest is not a lease." Tex. Bus. & Com. Code Ann. § 2A.103(10)
(Vernon Supp. 2006) (emphasis added). A "[l]ease agreement" is "the bargain, with
respect to the lease, of the lessor and the lessee in fact as found in their language or
by implication from other circumstances . . . as provided by this chapter." Id.
§ 2A.103(11). A "security interest," by contrast, is "an interest in personal property
. . . which secures payment or performance of an obligation." Tex. Bus. & Com.
Code Ann. § 1.201(35) (Vernon Supp. 2006). 

 Section 1.203 of the UCC distinguishes a lease from a security interest. For a
lease agreement to qualify as a security agreement, the consideration for the
transaction must not be subject to termination by the lessee and the agreement must
satisfy at least one of the four factors in subsection 1.203(b). Tex. Bus. & Com.
Code Ann. § 1.203(b) (Vernon Supp. 2006). Section 1.203 provides:

 Lease Distinguished From Security Interest

 (a) Whether a transaction in the form of a lease creates a lease or
security interest is determined by the facts of each case.


 (b) A transaction in the form of a lease creates a security interest if
the consideration that the lessee is to pay the lessor for the right
to possession and use of the goods is an obligation for the term of
the lease and is not subject to termination by the lessee, and:


 (1) the original term of the lease is equal to or greater than the
remaining economic life of the goods;


 (2) the lessee is bound to renew the lease for the remaining
economic life of the goods or is bound to become the
owner of the goods;


 (3) the lessee has an option to renew the lease for the
remaining economic life of the goods for no additional
consideration or for nominal additional consideration upon
compliance with the lease agreement; or 


 (4) the lessee has an option to become the owner of the goods
for no additional consideration or for nominal additional
consideration upon compliance with the lease agreement.


 . . . 


 

 Additional consideration is nominal if it is less than the lessee's
reasonably predictable cost of performing under the lease
agreement if the option is not exercised. Additional consideration
is not nominal if:



 . . . .



 
 when the option to become the owner of the goods is
granted to the lessee, the price is stated to be the fair
market value of the goods determined at the time the option
is to be performed.
 



 . . . .


Id. § 1.203 (emphasis added).

Discussion

Effect of Codification of Former UCC Section 1.201(37) as Section 1.203

 Section 1.203 became effective September 1, 2003. See id. It is substantively
identical to the portions of former UCC section 1-201(37) that distinguished leases
from security interests. Id. cmt. However, it was decided to codify the law, in part,
"to resolve an issue that created considerable confusion in the courts: what is a
lease?" Id. cmt. 2. (4) In the opinion of the drafters of the UCC, courts had focused on
the intent of the parties and, in doing so, had relied on factors that the courts thought
more consistent with sales or loans than leases but that, in fact, "were as applicable
to true leases as to security interests." Id. The comments to section 1.203 direct that,
in distinguishing a lease from a security agreement, we focus on economics, not on
the intent of the parties. Id.

 Whether a transaction is construed as a sale of personal property secured by a
security interest or whether it is construed as a lease is determined by applicable state
law. In re Bailey, 326 B.R. 156, 160 (Bankr. W.D. Ark. 2005); In re Copeland, 238
B.R. 801, 803 (Bankr. E.D. Ark. 1999). Because the UCC has been adopted
nationwide, the courts may look for guidance to decisions from other jurisdictions in
interpreting a uniform section of the Code. See In re Rebel Rents, Inc., 291 B.R. 520,
526 (Bankr. C.D. Cal. 2003); In re Copeland, 238 B.R. at 803. However, as the
majority points out, the codification of section 1.203 makes case law prior to the 2003
effective date of section 1.203 suspect to the extent that prior law focuses on the
intent of the parties to determine whether an agreement is a lease or a security
interest. See, e.g., Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc., 880
S.W.2d 67, 71 (Tex. App.--Houston [14th Dist.] 1994, writ denied) (test for creation
of security interest under UCC is whether transaction is intended to have effect of
security); cf. In re Triplex Marine Maint., Inc., 258 B.R. 659, 665-67 (Bankr. E.D.
Tex. 2000) (discussing problems with focus on parties' intent in determining whether
lease should be characterized as secured transaction). (5) 

 Texas law prior to the codification of section 1.201(37) as section 1.203
focused heavily on the second prong of the test for a security interest, namely,
whether the lease provided on its face that upon compliance with its terms the lessee
would become the owner of the property without paying additional consideration, or
by paying only nominal consideration, deeming such an agreement to be, as a matter
of law, intended for security. See Superior Packing, 880 S.W.2d at 71-72; see also
Franklin Nat'l Bank v. Boser, 972 S.W.2d 98, 103 (Tex. App.--Texarkana 1998, pet.
denied) (stating with regard to section 1.201(37), that "[t]his test focuses on the
economics of the transaction, rather than on the intent of the parties," but holding,
"[u]nder this section, if a 'lease' or 'lease/purchase' instrument provides on its face
that when the terms of the lease are complete the lessee becomes the owner of the
property for no additional consideration, the lease is, as a matter of law, a security
interest"); Horton v. Dental Capital Leasing Corp., 649 S.W.2d 655, 657 (Tex.
App.--Texarkana 1983, no writ) (if option price within an agreement with an option
to purchase is nominal, instrument constitutes security agreement). (6) If the evidence
shows the option price is not nominal, the instrument is not conclusively deemed a
security agreement. Horton, 649 S.W.2d at 657 (holding that because dental
equipment rental agreement denominated as lease provided that option price was fair
market value at time option was exercised, jury's failure to find that instrument was
not security agreement was not against great weight and preponderance of evidence);
Superior Packing, 880 S.W.2d at 72 (holding that when consideration lessee must pay
to become owner upon completion of terms of instrument is not nominal,
determination of whether lease was intended for security is fact question); Pierson v.
GFH Fin. Servs. Corp., 829 S.W.2d 311, 315-16 (Tex. App.--Austin 1992, no writ)
(evidence supported finding that lease was lease, rather than security agreement, even
though lease provided option to purchase at fair market value at end, where parties
indicated they intended to create lease and agreement was entitled lease); see also
Tex. Bus. & Com. Code Ann. § 1.203(d).

Construction and Application of Section 1.203

 First Prong of Section 1.203(b) Test: Terminability of Consideration

 In my opinion, the majority correctly focuses in this case on the first part of the
test of a security agreement under section 1.203, namely "the consideration that the
lessee is to pay the lessor for the right to possession and use of the goods is an
obligation for the term of the lease and is not subject to termination by the lessee. .
. ." Tex. Bus. & Com. Code Ann. § 1.203(b) (emphasis added). However, I disagree
with the majority's interpretation of the meaning and standard of proof of the first
prong of the test.

 Our April 19, 2007 opinion concluded that "Excel's leases expressly provide
that they are subject to termination by the lessee" and, therefore, that "Excel's
affirmative defense of nonownership based on its claim that its leases with its
customers were security agreements fails as a matter of law." In its motion for
rehearing, Excel argues that the panel made a mistake by interpreting subsection
1.203(b) as providing that if a lessee may terminate the lease, it is not a security
agreement. It correctly points out that UCC section 1.203(b) provides that "[a]
transaction in the form of a lease creates a security interest if the consideration that
the lessee is to pay the lessor for the right to possession and use of the goods is an
obligation for the term of the lease and is not subject to termination by the lessee" and
if one of the four additional conditions set out in subsection 1.203(b) is met. Id.
(emphasis added). Excel argues that while its customer agreements provide that
customers may terminate the lease, the agreements provide that they must still pay the
full consideration required by Excel for the right to possession and use of the vehicles
for the term of the lease.

 In its opinion on denial of Excel's motion for rehearing, the majority states,
"To create a security interest, the first part of this test requires that the rental
payments the lessee must pay cannot be terminable by the lessee during the term of
the lease." Excel Auto & Truck Leasing, LLP v. Alief Indep. Sch. Dist., No. 01-04-01185-CV, slip. op. at 9 (Tex. App.--Houston [1st Dist.] Aug. 30, 2007, no pet. h.)
(citing Tex. Bus. & Com. Code Ann. § 1.203) (emphasis added). It thus interprets
consideration as "the rental payments." The majority then states that the Lease is not
a security interest because it contains no "'hell or high water clause,' which is
essential to the existence of a security interest." Excel Auto & Truck Leasing, slip op.
at 9. 

 I agree with the majority that Excel's Lease Agreement is not a security
agreement because the stream of rental payments (the consideration) is terminable
prior to the end of the lease term. The critical reason for holding the consideration
terminable, however, is not that upon complying with the early termination provisions
the lessee is released from making further rental payments, it is that he is released
from any further obligation to Excel and is not obligated to pay the entire amount of
money he would be required to pay if he continued the lease to the end; he pays less. 
I also strongly disagree with the majority's statement that the essence of a security
interest is a "hell or high water" clause and its implicit holding that a "hell or high
water" clause is a talisman for finding a security interest instead of a lease. I believe
this implicit holding is both inaccurate and misleading and can only introduce even
further confusion into this difficult area of the law in which courts are required to
distinguish among (1) a true lease; (2) a true lease that is a finance lease; and (3) a
security interest retained by the lender in a financing transaction to secure the
debtor's performance, which is not a lease.

Finance Lease

 The majority confuses a finance lease, which is one type of true lease, with a
security interest, which is not a lease at all. A "hell or high water" clause is not the
essence of a security interest. It can appear in any kind of agreement, but it is, in
particular, the essence of a finance lease, which is a true lease governed by article 2A
of the UCC, not a secured transaction, which is governed by article 9 of the UCC. 
See Triplex, 258 B.R. at 665-67.

 A finance lease is a three-party transaction. It is defined by the UCC as "a
lease with respect to which . . . the lessor does not select, manufacture, or supply the
goods"; "the lessor acquires the goods or the right to possession and use of the goods
in connection with the lease"; and one of four other conditions is met, i.e., (i) the
lessee receives a copy of the contract by which the lessor acquired the goods or the
right to their use and possession; (ii) the lessee's approval of the contract by which
the lessor acquired the goods or the right to their use and possession is a condition
to the effectiveness of the lease (iii) the lessee, before signing the lease contract,
receives a statement designating the promises and warranties and disclaimers
provided to the lessor by the third party's supplier; or, (iv) if the lease is not a
consumer lease, the lessor informs the lessee in writing of (a) the identity of the
supplier unless the lessee has selected the supplier and directed the lessor to acquire
the good or the right to use and possession, (b) the lessee's entitlement to promises
and warranties provided to the lessor by the supplier, and (c) the lessee's right to
communicate with the supplier and receive the warranties and disclaimers from it. 
Tex. Bus. & Com. Code Ann. § 2A.103(7) (Vernon Supp. 2006) (emphasis added). 

Hell or High Water Clause

 A "hell or high water" clause is defined by article 2A of the UCC, governing
leases, as "a term in the lease agreement that provides that the lessee's promises under
the lease contract become irrevocable and independent upon the lessee's acceptance
of the goods. . . ." Tex. Bus. & Com. Code Ann. § 2A.407(a) (Vernon 1994)
(emphasis added); see also id. cmt. 1 (extending "hell or high water" protection to
leases that are not consumer leases). The "hell or high water" clause "makes
covenants in a finance lease irrevocable and independent due to the function of the
finance lessor in a three party relationship: the lessee is looking to the supplier to
perform the essential covenants and warranties. . . . Thus, upon the lessee's
acceptance of the goods the lessee's promises to the lessor under the lease contract
become irrevocable and independent." Id. cmt. 1 (citation omitted); see also
GreatAmerica Leasing Corp. v. Star Photo Lab, Inc., 672 N.W.2d 502, 504 (Iowa Ct.
App. 2003) ("hell or high water" clause "makes a lessee's obligation under a finance
lease irrevocable upon acceptance of the goods, despite what happens to the goods
afterwards."). The clause, as characterized by the UCC for finance leases, is thus a
specialized clause peculiar to a three-party transaction, which insures that the
payments owed by the lessee to a lessor who does not manufacture or supply the
leased goods are independent of the state of the goods and irrevocable, so that the
lessee looks to the manufacturer or supplier of goods for warranties and remedies for
defects in the goods, not to the lessor. It does not merely indicate that payments
under a lease cannot be terminated before completion of the lease clause; it indicates
more.

 A "hell or high water" clause is thus neither the essential feature of a security
agreement nor a distinguishing feature between a lease and a security agreement. 
Indeed, if the first prong of section 1.203(b)'s two-pronged test for a security
agreement could be satisfied only by the agreement's incorporating the essential
feature of a type of true lease, as the majority implicitly holds, section 1.203(b) would
serve no function other than to confuse courts and litigants, and it would not meet the
UCC drafters' goal in codifying section 1.203 of providing guidance to courts to
enable them to distinguish between a lease and a security agreement. See Tex. Bus.
& Com. Code Ann. § 1.203 cmt. 2.

Non-Terminability of Consideration as Test of Security Agreement Under Section
1.203(b)


 I would hold that the first prong of section 1.203(b)'s "bright line" test for
distinguishing between a security agreement and a lease should be interpreted
according to its plain language and the intent of the section's drafters. Specifically,
"A transaction in the form of a lease creates a security interest [1] if the consideration
that the lessee is to pay the lessor for the right to possession and use of the goods is
an obligation for the term of the lease and [2] is not subject to termination by the
lessee." Tex. Bus. & Com. Code Ann. § 1.203(b). Under this test, it is not necessary
that the agreement contain a true "hell or high water" clause as defined in article 2A
of the UCC to constitute a security interest; it must only provide that the full
consideration due under the terms of the lease not be terminable by the lessee. Here, the obligation of a lessee to Excel is expressly made subject to early
termination by the lessee, relieving the lessee of the obligation to pay Excel the total
amount due for possession and use of the vehicle for the full term of the Lease. The
lessee may terminate his own obligation under the Lease at any time, return the
vehicle, and pay Excel less than he would have to pay if he completed the lease. 
Upon the vehicle's return at any time, Excel subtracts the Retained Value of the
vehicle from the total consideration due and adds any agreed upon fees and charges,
and the lessee is relieved of any further obligation. Indeed, the lessee does not even
have the option to purchase the vehicle until he has completed a specified number of
monthly payments. Nor is Excel required to provide a purchase option. 

 I agree with the majority, therefore, that, in this case, it is unnecessary to look
beyond the first prong of section 1.203's bright line test to determine that the Lease
is not a security interest because the consideration due under its terms is terminable
prior to the end of the lease term by the lessee; therefore, the first prong of section
1.203(b)'s bright line test of a security agreement is not satisfied. If the Excel Lease
Agreement had satisfied the first prong of section 1.203(b)'s test of a security
agreement, however--if, for example, it had had a "hell or high water clause" the
Agreement still would not necessarily have been a security interest instead of a lease.

 Second Prong of Section 1.203(b) Test: Distinction Between Lease and
Security Interest


 A lessee's inability to terminate a lease without paying the full consideration
due under the agreement is only the first criterion a security interest must meet; a
transaction in the form of a lease that meets that criterion must still satisfy one of the
subparts of section 1.203 to be considered a security interest. See, e.g., In re Bailey,
326 B.R. 156, 162 (Bankr. W.D. Ark. 2005) (if lessee does not have right to terminate
alleged equipment lease, but none of four statutory conditions is satisfied, then court
cannot find, as matter of law, that alleged lease is actually disguised security
agreement; it must still examine specific facts of case to determine whether, despite
failing "bright line" test, economics of transaction still suggest security interest); In
re Vital Prods. Co., 210 B.R. 109, 112 (Bankr. N.D. Ohio 1997) (so-called lease was
security agreement where it obligated lessee to make stream of payments for entire
term of lease with no right to terminate and enabled lessee to acquire leased property
for nominal payment considerably less than anticipated remaining fair market value,
economically compelling lessee to exercise buyout); cf. In re Charles, 278 B.R. 216,
222 (Bankr. D. Kan. 2002) (to find security interest rather than lease, statute requires
"hell or high water clause" and lessor's not retaining any residual value or interest in
leased property based upon four factors outlined in statute).

 If a transaction in the form of a lease has a "hell or high water" clause, or other
non-terminability provision, satisfaction of the first prong of the test is not a factor
in determining whether the transaction is a lease or a security agreement because such
a provision may appear in either a lease, including a finance lease, or a security
agreement. In that case, the courts must look to the definition of a lease (including
the definition of a financing lease in section 2A.1.03(74)) and of a security interest, (7)
and also to the facts of the case, to determine whether the instrument is a lease or a
security interest. See Triplex, 258 B.R. at 667-69 (holding that agreement which
contained "hell or high water" clause was security agreement "as a matter of law,"
even though agreement itself stated it was finance lease, when lease was not
terminable by lessee prior to end of designated lease term and one of four factors
enumerated in section 1.203(b) was satisfied); In re Extraction Techs., 296 B.R. 393,
398, 400-02 (Bankr. E.D. Va. 2001) (alleged equipment lease under which lessor
would have no choice other than to make alleged "option" payment and become
owner of equipment at end of lease term and under which lessee's payments precisely
equaled lessor's costs in acquiring equipment, together with interest, was not true
"lease" but disguised security agreement, despite denomination as finance lease); see
also United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 617 (7th Cir. 2005)
(transaction in form of facilities lease was not "true lease" but financing device where
(i) it contained "hell or high water" clause; (ii) at end of lease lessor had no remaining
interest, contrary to transaction language; rather, full tenancy interest reverted to
lessee for no additional charge, satisfying "the UCC's per se rule for identifying
secured credit"; (iii) balloon payment had no parallel in true lease, but was common
feature of secured credit; and (iv) on prepayment, lease and sublease would terminate
immediately rather than secure tenant's right to occupy property for additional
period); cf. In re Rebel Rents, 291 B.R. at 527-28 (lessee did not satisfy burden of
showing that equipment leases executed as part of sales-and-leaseback arrangement
were not true leases but disguised security agreements where, although debtor did not
have option of terminating leases early and paid all taxes, maintenance, and insurance
on equipment and assumed all risk of loss, lease terms were for less than useful lives
of equipment and debtor did not have option at end of lease terms to renew leases or
to purchase equipment for no or nominal consideration); Siemens Credit Corp. v.
Newlands, 905 F. Supp. 757, 763 (N.D. Cal. 1994) (lease was finance lease where
lessor did not select manufacturer of supply equipment, lessor acquired equipment
only to lease it to lessee, and lessee executed purchase agreement assignment, which
it received and approved in connection with execution of lease). 

 The Excel Lease does not attempt to secure the lessee's performance until the
consideration due for the entire lease term is paid and the purchase option exercised,
i.e., the Lease does not satisfy the first test of a security interest. See In re
Quisenbery, 295 B.R. 855, 860 (Bankr. N.D. Tex. 2003). But even if it had satisfied
that prong, it would not satisfy the second. In particular, the fact that lessees have a
purchase option does not make the transaction evidenced by the Excel Lease a
secured financing transaction for the purchase of a vehicle. There is no reference to
"sale" or "collateral" or to the parties' intent to create a security interest; quite the
contrary. Nor does the Lease evidence the parties' intent that a sale take place and
that title pass from Excel to the lessee. Rather, title remains with Excel unless and
until specified conditions set out in the Lease are satisfied and the purchase option
is both granted and exercised. Indeed, the Excel Lease satisfies the "hallmark" of a
lease in that it grants the lessee the right to use the vehicle for a period less than its
economic life with the concomitant obligation (unless the purchase option is
exercised) to return the property to the lessor, Excel, while it still retains some
substantial economic value. See In re QDS Components, Inc. 292 B.R. 313, 322
(Bankr. S.D. Ohio 2002); see also In re Marhoefer Packing Co., Inc., 674 F.2d 1139,
1145 (7th Cir. 1982); In re Shores, 332 B.R. 31, 39 (M.D. Fla. 2005).

 A number of other courts have reached the same conclusion on a similar basis. 
See In re Powers, 983 F.2d 88, 91 (7th Cir. 1993) (concluding that "even though the
lessee can acquire the goods at the end of the lease's term, the lessee is under no
obligation to make the payments that will allow him to exercise the option"); In re
Marhoefer, 674 F.2d at 1143 (holding that "where the lessee has the right to terminate
the transaction, it is not a conditional sale"); In re Celeryvale Transp., Inc. v. M.W.
Kellogg Co., 822 F.2d 16, 18 (6th Cir. 1987) (holding that lease was true lease, rather
than security instrument in disguised sale, where lessee was obligated to return leased
equipment at lease's end if it decided not to invoke purchase option, but had no
obligation to exercise option to purchase property); In re Shores, 332 B.R. at 39
(holding that agreement was true lease where agreement expressly stated that lessee
could terminate lease at any time by written notice to lessor and have no further
obligation except for liability for damage to leased property during lease term and
where useful life of leased property exceeded term of lease ); In re Copeland, 238
B.R. 801, 806 (Bankr. E.D. Ark. 1999) (holding, under Arkansas law, that even
though section 1.203 "does not require a finding as a matter of law that a transaction
is a true lease based only on the fact the lessee may terminate the lease at any time,"
this fact precluded finding that transaction was sale). 

 Excel's Motor Vehicle Lease Agreement is what it says it is: "a lease only" that
transfers "no ownership interests in the Vehicle except for any future option to
purchase provided in this Lease." The lessees are lessees as the UCC defines that
term (as "a person who acquires the right to possession and use of goods under a
lease"); Excel is a lessor as the UCC defines the term (as "a person who transfers the
right to possession and use of goods under a lease"); and the Lease Agreement is a
true lease agreement and not a sales contract that creates a security interest in the
collateral, as defined in the UCC ("[a] 'sale' consists in the passing of title from the
seller to the buyer for a price"; a "[c]ontract for sale' includes both a present sale of
goods and a contract to sell goods at a future time"). Tex. Bus. & Com. Code Ann.
§§ 2A.103 (defining "lessee" and "lessor"), 2.106 (defining "sale" and "sales
contract").

 Because Excel's Motor Vehicle Lease Agreement is a true lease, the lessees are
not owners of the leased vehicles. Excel is the owner of the vehicles for UCC
purposes as well as ad valorem tax purposes.

Conclusion


 I would grant Excel's motion for rehearing. I would hold that, for the
foregoing reasons, the taxing authorities conclusively established their right to
summary judgment. Therefore, I concur in the panel's judgment affirming the
summary judgment in favor of the taxing authorities.




 Evelyn V. Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Hanks.


Justice Keyes, concurring in the judgment.


Justice Keyes, dissenting from denial of rehearing.
1. The Tax Code provides an exemption for motor vehicles leased for personal use if the
lease was entered into after January 2, 2001, provided that the lessor requires the
lessee to complete a form certifying that the vehicle is not used for the production of
income. Tex. Tax Code Ann. § 11.252(d) (Vernon Supp. 2006).
2. Whether a transaction is a lease or a sale is important for commercial purposes and
for the determination of creditors' rights under the Bankruptcy Code. A true lease is
subject to article 2A of the UCC; but a sale is not a lease and, therefore, is not subject
to article 2A. See Tex. Bus. & Com. Code Ann. § 2A.102 cmt. 1 (Vernon 1994)
("[T]he definition of lease does not include a sale. . . or retention or creation of a
security interest. . . ; sales and security interests are governed by other Articles of this
Act."); see also id. § 2A.103(10) (Vernon Supp. 2006) ("'Lease' means a transfer of
the right to possession and use of goods for a term in return for consideration, but a
sale . . . , or retention or creation of a security interest is not a lease."); Franklin Nat'l
Bank v. Boser, 972 S.W.2d 98, 102-04 (Tex. App.--Texarkana 1998, pet. denied)
(provisions of article 9 of UCC apply to secured transaction disguised as lease);
Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc., 880 S.W.2d 67, 71 (Tex.
App.--Houston [14th Dist.] 1994, pet. denied) (same); see also In re Bailey, 326
B.R.156, 160 (Bankr. W.D. Ark. 2005) (if transaction is construed as sale of personal
property and is secured by perfected security interest, debtor in bankruptcy must
propose to treat creditor's claim as provided in section 1325(a)(4) and (5) of
Bankruptcy Code; if transaction is true lease and Debtor desires to keep property, then
Debtor must assume lease, cure all defaults, and perform lease according to its terms
in compliance with sections 1322(b)(7) and 365 of Code).
3. The Lease provides that at the beginning of the Lease, the Adjusted Lease Balance is
equal to the Adjusted Capitalized Cost of the vehicle, i.e., the Gross Capitalized Cost
minus the amount of any net trade-in allowance, rebate, noncash credit, or cash that
reduces the Gross Capitalized Cost, i.e., that reduces the agreed upon value plus any
items paid over the lease term, such as service contracts, insurance, and outstanding
prior credits or lease balances. If all payments are made on time and other lease
obligations are met, the monthly payments are "applied to reduce the Adjusted Lease
Balance so that at the end of the Lease term the Adjusted Lease Balance equals the
Vehicle's Residual Value," i.e., its wholesale value as determined by Excel, in
accordance with industry standards, "by obtaining a wholesale cash bid for the
purchase of the Vehicle or by disposing of the Vehicle in an otherwise commercially
reasonable manner." The Realized Value is zero if the vehicle is not returned. 
4. The drafters of the UCC were likewise driven to codify the law with respect to the
lease of goods by similar uncertainty in the definition of a lease, specifically by the
necessity "to define lease to determine whether a transaction creates a lease or a
security interest disguised as a lease." Tex. Bus. & Com. Code Ann. § 2A.103 cmt.
j (Vernon 1994). The drafters pointed out:


 If the transaction creates a security interest disguised as a lease, the
transaction will be governed by the Article on Secured Transactions
(Article 9) and the lessor will be required to file a financing statement
or take other action to perfect its interest in the goods against third
parties. There is no such requirement with respect to leases under the
common law and, except with respect to leases of fixtures (Section 2A-309), this Article imposes no such requirement. Yet the distinction
between a lease and a security interest disguised as a lease is not clear
from the case law. . . .

 Id.
5. The distinction is important in this case because Excel's Lease Agreement provides
that it is a lease and that conveys no ownership interest "except for any future option
to purchase provided in this Lease." See In re Triplex Marine Maint., Inc., 258 B.R.
659, 666 (Bankr. E.D. Tex. 2000) ("[T]he jurisprudence is clear that, in determining
whether a document is a true lease or a disguised security agreement, this court is not
bound by any 'acknowledgment' by the Debtor and not by any other language or
designation of parties contained in the agreement"). I note, however, that the
intention to create a security interest remains the distinguishing characteristic of a
security interest. See note 7 infra. Therefore, intent in that sense remains an
important consideration in a section 1.203 analysis.
6. The Horton court further observed that two alternative tests were used to determine
whether the option price was nominal:

 

 The first is to compare the option price to the market value of the
equipment at the time the option is exercisable. If the option price is
substantially less than the market value, the option price is nominal. 
The second test is to determine whether the terms of the option do not
leave the lessee with any sensible alternative but to exercise the option. 
The two tests are not cumulative, but are alternative. 


 Horton v. Dental Cap. Leasing Corp., 649 S.W.2d 655, 657 (Tex. App.--Texarkana
1983, no writ). The UCC's test for whether the purchase price is nominal or not is
now set out in subsection 1.201(d), quoted supra.
7. Under the UCC, a "security agreement" is not required to have any particular form. 
Rather, the UCC defines a security agreement merely as "an agreement that creates
or provides for a security interest." Tex. Bus. & Com. Code Ann. § 9.102(74)
(Vernon Supp. 2006). Generally, the test for the creation of a security interest under
Texas law is whether the transaction was intended to have the effect of security
because the parties must have intended that their transaction fall within the scope of
the UCC's provisions governing secured transactions. Morgan Bldgs. & Spas, Inc.
v. Turn-Key Leasing, Ltd., 97 S.W.3d 871, 876 (Tex. App.--Dallas 2003, pet.
denied). Accordingly, the court must look to the transaction to determine whether the
parties intended to create a security interest in the property for the purpose of securing
payment or performance of an obligation. Id. No formal wording is required to create
a security interest; rather, the court should examine the substance of the documents
in light of the circumstances of the case. Id. The true intent of the parties is
determined by examining "the entire writing in an effort to harmonize and give effect
to all the provisions of the contract so that none will be rendered meaningless." Id.
(quoting Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)); see also In re
Quisenberry, 295 B.R. 855, 860-61 (Bankr. N.D. Tex. 2003) (security agreement is
agreement that creates or provides for an interest in personal property that secures
payment or performance of some obligation; key requirement is that agreement, or
some ancillary document, create or provide for security interest; in construing security
agreement, primary role of court is to ascertain true intent of parties); In re Sutton,
365 B.R. 900, 905 (B.A.P. 8th Cir. 2007) (security agreement need not be
denominated as such or have any particular form; all that is required is objective
manifestation in language of debtor's agreement to grant security interest in collateral
in favor of creditor).